Catherine E. Ybarra (SBN # 283360)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Tel: (213) 297-3807
E: cybarra@sirillp.com

Sonjay C. Singh (*pro hac vice anticipated*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Andrew R. Tate (*pro hac vice anticipated*)
**PRIVACY RIGHTS LAW LLC**
3379 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326
Tel: (678) 250-5885
E: tate@privacyrightslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**DANIELLE TILLERY, MICHAEL WALSH and DAVID ROSENBERG**, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

**SAMSUNG ELECTRONICS AMERICA, INC.**,

*Defendant*.

Case No.: 3:26-cv-11448

**CLASS ACTION COMPLAINT FOR PUBLIC INJUNCTION, DAMAGES, AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

Plaintiffs Danielle Tillery, Michael Walsh, and David Rosenberg (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows against Defendant Samsung Electronics America, Inc. ("Samsung" or "Defendant"):

## I. INTRODUCTION

1. Samsung tells the millions of Americans who set up its televisions that it "neither collects any video footage nor any content displayed on the Device." That statement is false. Roughly twice every second, Samsung Smart televisions ("Samsung Smart TVs") capture what is displayed on the screen—every program, every game, every home video, every connected device—reduce it to a digital fingerprint, and transmit it, together with persistent identifiers tied to the individual, the household, the device, and the home network, to servers that feed Samsung's multi-billion-dollar advertising business. This case is about that surveillance: the Automatic Content Recognition ("ACR") technology Samsung uses to conduct it, the false assurances and manipulative design Samsung deploys to manufacture "consent" to it, and the state and federal laws Samsung violates by doing so—despite years of public warnings about Smart TV ACR surveillance that Samsung has disregarded. Plaintiffs bring this consumer-privacy and consumer-protection class action under federal and state law to redress Defendant's invasion of Plaintiffs' privacy and Defendant's interception, disclosure, and monetization of Plaintiffs' communications and personal information without informed consent.

2. Defendant's ACR data-collection conduct is not the product of inadvertence or ignorance. Defendant has knowingly continued, expanded, and deepened that conduct over many years, despite a documented sequence of public regulatory, law-enforcement, and academic warnings that put Defendant squarely on notice that the conduct is unlawful.

3. In 2017, the Federal Trade Commission and the New Jersey Attorney General obtained a $2.2 million settlement from Vizio, Inc. for the same kind of undisclosed Smart TV ACR data-collection conduct alleged here. *See United States v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J.). Defendant nonetheless initiated, and continues to operate, its own ACR data-collection program on Samsung Smart TVs.

4. For most of the relevant period, Defendant has operated its own proprietary ACR system on Samsung Smart TVs—built after early vendor-assisted deployments with Yahoo! Inc. and Enswers, Inc.—and operated in connection with Defendant's Samsung Ads advertising business.

5. Despite these clear signals to cease its invasion of Americans' privacy in their own homes, as of the filing of this Complaint, Defendant continues to operate its ACR pipeline on millions of Samsung Smart TVs in the United States, including those owned by Plaintiffs and Class Members.

6. The viewing data and persistent identifiers Defendant captures from each Samsung Smart TV are transmitted in real time and near-real time to Defendant and to a network of corporate recipients, including advertising, measurement, and identity-resolution partners. Each such recipient independently captures, processes, and uses Plaintiffs' and Class Members' intercepted communications and identifiers to construct cross-device household identity graphs, target individual consumers across devices for advertising, and resell the resulting audience products to advertisers, agencies, data brokers, and identity-resolution providers.

7. Defendant's ACR practices have already drawn law-enforcement action. In December 2025, the State of Texas sued Defendant under the Texas Deceptive Trade Practices Act over these same practices, alleging that "Samsung Smart TVs are watching you back" and that Samsung's consent process was deceptive and misleading. In February 2026, Samsung resolved that action by accepting a court-ordered permanent injunction requiring it, going forward, to disclose clearly and conspicuously that "Viewing Information Services uses Automatic Content Recognition technology to identify and analyze content on your device" and to obtain consumers' affirmative express consent before collecting viewing data.

8. Defendant's underlying business model is the same model prosecuted by the FTC and the New Jersey Attorney General in 2017: sell televisions at competitive prices and recoup margin (and then some) by surreptitiously monetizing the viewing behavior of the consumers who buy them. By 2021, public reporting indicated that Vizio earned more in profit from the sale of

ACR-derived viewer data than from the sale of its televisions themselves. Defendant's ACR practices are materially the same as the practices for which Vizio was admonished.

9. Defendant does not obtain its customers' informed consent to this surveillance. On the contrary, Defendant actively conceals the existence, scope, and operation of the ACR data collection behind benign-sounding feature names and dense, multi-screen setup flows; enables the data collection by default or through pre-checked, dark-pattern interfaces; and buries any opt-out controls.

10. Plaintiffs are California consumers who, individually and on behalf of similarly situated consumers, bring this action to redress Defendant's unlawful conduct. Each Plaintiff purchased and used a Samsung Smart TV in his or her home, and each had his or her viewing communications and persistent identifiers—including IP address, device identifiers, and Samsung's "Personalized Service ID" ("PSID")—(collectively, "Sensitive Information") intercepted, recorded, transmitted, and disclosed by Defendant's ACR pipeline ("ACR Tools") without informed consent.

11. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties; (iii) loss of the benefit of the bargain; (iv) diminution in the value of, and loss of the ability to control, their Sensitive Information; (v) statutory damages where applicable; and (vi) continued and ongoing risk to their Sensitive Information.

12. Therefore, Plaintiffs seek, on behalf of themselves and a Class of similarly situated persons, to remedy these harms and to assert claims against Defendant for invasion of privacy (intrusion upon seclusion and public disclosure of private facts), invasion of privacy in violation of the California Constitution, violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and 638.50—638.51, violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510*, et seq.*, violation of the Video Privacy Protection Act

("VPPA"), 18 U.S.C. § 2710, common-law negligence, violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750–1784, common-law unjust enrichment, and a public injunction on behalf of the general public under California law.

## II. THE PARTIES

13. **Plaintiff Danielle Tillery** is a resident and citizen of San Francisco County, California. Plaintiff Tillery purchased a Samsung Smart TV (Model No. UN55NU7100FXZA) from Best Buy in approximately 2019 and has used it regularly since then in her home in San Francisco, California, where she and another member of her household have used it to watch television and streaming programming through applications including Netflix, HBO Max, Amazon Prime Video, Tubi, and Philo. Plaintiff Tillery set up the television herself.

14. At no time was Plaintiff Tillery presented with, or did she knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of her viewing activity or associated data.

15. Unbeknownst to Plaintiff Tillery, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed her Sensitive Information during her use of the Samsung Smart TV, including every image displayed on her screen and the television programming, streaming, and other video content she and her household viewed on the television as described above, throughout the period of her ownership and use. This content communicated her likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties, on information and belief including downstream advertising and identity-resolution partners, to create an identity graph of her to analyze, make inferences about, and monetize her behavior, and Plaintiff Tillery never consented to that conduct.

16. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Tillery would not have purchased the Samsung Smart TV, or would have paid substantially less for it.

17. **Plaintiff Michael Walsh** is a resident and citizen of Los Angeles County, California. Plaintiff Walsh purchased a Samsung Smart TV (Model No. UN55TU700DF) from Best Buy in approximately 2020 to 2021 and has used it regularly since then in his home in Whittier, California, where he and one other adult member of his household have used it to watch television and streaming programming, including Just Shoot Me, 9-1-1, Abbott Elementary, and High Potential, through applications including Netflix, HBO Max, and Disney+. Plaintiff Walsh set up the television himself.

18. At no time was Plaintiff Walsh presented with, or did he knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of his viewing activity or associated data.

19. Unbeknownst to Plaintiff Walsh, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed his Sensitive Information during his use of the Samsung Smart TV, including every image displayed on his screen and the television programming, streaming, and other video content he and his household viewed on the television as described above, throughout the period of his ownership and use. This content communicated his likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties, on information and belief including downstream advertising and identity-resolution partners, to create, an identity graph of him to analyze, make inferences about, and monetize his behavior, and Plaintiff Walsh never consented to that conduct.

20. Had Defendant disclosed the ACR data collection described herein at the point of sale, Plaintiff Walsh would not have purchased the Samsung Smart TV, or would have paid substantially less for it.

21. **Plaintiff David Rosenberg** is a resident and citizen of Contra Costa County, California. Plaintiff Rosenberg purchased a Samsung Smart TV (Model No. UN75H6350AF) from Best Buy in September 2014, for $2,499.99 less a $500.00 discount, and the television was delivered on September 19, 2014. He has used it regularly since then in his home in Danville, California, where he, his wife, and other members of his family have used it for approximately five

or more hours per weekday (typically 6:00 to 11:30 p.m.) and ten or more hours per weekend day, to watch, among other things, live network and sports programming on ESPN (including SportsCenter and NFL, NBA, and college basketball games), ABC (including Grey's Anatomy, The Bachelor, Dancing with the Stars, High Potential, and Abbott Elementary), NBC (including Saturday Night Live, The Voice, and NFL and NBA games), and Fox (including The Masked Singer and NFL games), as well as programming accessed through the YouTube TV, Hulu, Apple TV, and Netflix applications. Plaintiff Rosenberg did not set up the television himself; it was delivered, installed, and configured by a third-party Best Buy "Geek Squad" technician. Plaintiff Rosenberg is a senior citizen within the meaning of Cal. Civ. Code § 1761(f).

22. At no time was Plaintiff Rosenberg presented with, or did he knowingly agree to, any terms of use, privacy disclosure, or consent mechanism describing or authorizing Defendant's or any third party's collection, interception, or use of his viewing activity or associated data.

23. Unbeknownst to Plaintiff Rosenberg, Defendant's ACR Tools surreptitiously intercepted, transmitted, and disclosed his Sensitive Information during his use of the Samsung Smart TV, including every image displayed on his screen and the television programming, streaming, and other video content he and his household viewed on the television as described above, throughout the period of his ownership and use. Because Plaintiff Rosenberg has owned and used his television since 2014, his ownership spans the full evolution of Defendant's ACR program—from the vendor-assisted SyncPlus and Yahoo Broadcast Interactivity era through Defendant's proprietary Viewing Information Services and Samsung Ads ACR system. This content communicated his likes, dislikes, interests, and habits over a significant amount of time. Defendant's ACR Tools further created, or allowed third parties to create, profiles and identity graphs of him to analyze, make inferences about, and monetize his behavior, and Plaintiff Rosenberg never consented to that conduct.

24. Each named Plaintiff continues to own and use his or her Samsung Smart TV, which remains operational and connected, such that each Plaintiff's viewing activity and associated identifiers remain subject to Defendant's ongoing, continuous ACR interception, collection,

transmission, and disclosure. Absent injunctive relief, Defendant's unlawful conduct will continue to capture and disclose Plaintiffs' Sensitive Information, and Plaintiffs therefore face a real and immediate threat of continuing and future injury that monetary damages cannot remedy.

25. **Defendant Samsung Electronics America, Inc.** ("Samsung" or "Defendant") is a corporation organized under the laws of New York, with its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey. Samsung Electronics America, Inc. is the U.S. sales, marketing, and distribution subsidiary of Samsung Electronics Co., Ltd., and is responsible for the marketing, distribution, sale, and post-sale software support of Samsung Smart TVs throughout the United States, including in California.

26. The product labels affixed to the back of Samsung Smart TVs—including Plaintiffs' televisions—identify "Samsung Electronics America Inc." as the entity responsible for their distribution, confirming that Defendant is the entity that placed the televisions at issue into the stream of commerce.

27. Defendant operates and profits from the ACR data-collection program described in this Complaint and is responsible for the design, configuration, and ongoing operational support of the ACR functionality on Samsung Smart TVs.

## III. JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class contains more than 100 members; and minimal diversity exists because at least one Class Member is a citizen of a state different from Defendant.

29. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the VPPA, 18 U.S.C. § 2710, and the ECPA, 18 U.S.C. § 2510 *et seq*.

30. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same common nucleus of operative facts as the federal claims.

31. This Court has personal jurisdiction over Defendant Samsung Electronics America, Inc. because it has purposefully availed itself of the privilege of conducting business in California and within this District. Defendant designs, markets, distributes, and sell millions of Samsung Smart TVs to California residents through nationwide retailers (including Amazon, Best Buy, Costco, Sam's Club, Target, and Walmart) and through e-commerce channels directed at California consumers; it remotely delivers firmware, software, and over-the-air updates to Smart TVs operating in this District; and it continuously and systematically intercepts, collects, transmits, and monetizes data from Samsung Smart TVs located in this District. Defendant's alleged tortious and statutory violations were expressly aimed at, occurred within, and caused harm in this District.

32. Defendant markets, distributes, sells, and provides ongoing software and data services for Smart TVs throughout the United States, including throughout California and within this District.

33. Defendant derives substantial revenue from the sale of Smart TVs in California and from the monetization of consumer data collected from those devices.

34. Defendant also directs advertising, software updates, and data collection services toward Smart TVs located in California, including those owned by Plaintiffs and members of the proposed Class.

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

36. Specifically, Samsung Smart TVs equipped with ACR technology were sold, installed, and used by consumers within this District.

37. The unlawful collection and transmission of viewing data described in this Complaint occurred on devices located within this District.

38. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is subject to personal jurisdiction in this District with respect to this action and therefore resides in this District for venue purposes.

39. Samsung's advertising and data-monetization operations maintain a substantial presence in Northern California: Samsung Ads maintains offices at the Mountain View, California campus that houses the headquarters of Samsung Research America, and Samsung Ads has publicly touted its command of the majority of the United States ACR footprint.

40. The ACR technology deployed on Samsung Smart TVs in the 2012–2014 era also originated in Northern California: Yahoo's SoundPrint ACR—integrated into Samsung's SyncPlus platform beginning in 2012—was developed by IntoNow, a Palo Alto, California company that Yahoo, then headquartered in Sunnyvale, California, acquired in 2011.

41. On information and belief, non-party participants in the connected-television advertising ecosystem through which Samsung's ACR-derived viewing data is matched, activated, and measured are located in this District and in California: LiveRamp, Inc. is headquartered in San Francisco, California; Adobe Inc. is headquartered in San Jose, California; Google LLC is headquartered in Mountain View, California; Experian's North American marketing and consumer-data operations are headquartered in Costa Mesa, California; and The Trade Desk, Inc. is headquartered in Ventura, California.

42. Intradistrict Assignment: Pursuant to Civil Local Rule 3-2(c) and (d), this action is properly assigned to the San Francisco Division because a substantial part of the events giving rise to Plaintiffs' claims occurred in San Francisco County and Contra Costa County, where Plaintiffs Tillery and Rosenberg, respectively, reside and have used their Samsung Smart TVs.

## IV. ARTICLE III STANDING

43. Each named Plaintiff has Article III standing to bring the claims asserted herein. Each Plaintiff has suffered a concrete and particularized injury-in-fact that is fairly traceable to Defendant's conduct and that is redressable by a favorable judicial decision. *See, e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

44. First, each Plaintiff has suffered an actual, concrete invasion of privacy—the kind of harm that has long been recognized as actionable both at common law and under California and federal statutory law. The interception, recording, real-time disclosure, identification, and re-distribution of an individual's in-home audiovisual viewing communications by an internet-connected Smart TV is precisely the sort of intrusion that the common-law privacy torts of intrusion upon seclusion and public disclosure of private facts, the California Constitution's right of privacy (Art. I, § 1), the California Invasion of Privacy Act, the federal Wiretap Act, and the Video Privacy Protection Act were enacted to address. *See TransUnion*, 594 U.S. at 425 (intangible harms with "a close historical or common-law analogue" satisfy concreteness).

45. Second, each Plaintiff has suffered a loss of control over his or her personal information and a diminution in its value. Defendant's ACR pipeline captured each Plaintiff's household-level identifiers, IP addresses, device and advertising identifiers, and viewing-behavior data, and disclosed that information to third parties, depriving each Plaintiff of the ability to control or monetize his or her own data and injecting it into proprietary identity graphs from which Plaintiffs are excluded.

46. Third, each Plaintiff has suffered economic injury, including (i) the loss of the benefit of the bargain (Plaintiffs would not have purchased their Samsung Smart TVs at the prices paid, and on information and belief would have paid less or nothing at all, had Defendant disclosed the true nature, scope, and downstream uses of the ACR-derived data collection at the point of sale) and (ii) the diminution in value of, and loss of ability to control or monetize, their personal information.

47. In addition, Defendant's ACR conduct imposes an ongoing, out-of-pocket cost on each Plaintiff. Because the ACR functionality captures, processes, and transmits fingerprints whenever the television displays content, it continuously draws metered electricity that each Plaintiff pays for at a per-kilowatt-hour rate—consuming, upon information and belief, on the order of a kilowatt hour per television each year for the ACR surveillance itself—so that each Plaintiff pays, without knowledge or consent, for the electricity used to invade his or her privacy.

48. Fourth, where applicable, each Plaintiff is entitled to statutory damages under CIPA (Cal. Penal Code § 637.2 ($5,000 per violation)), the federal Wiretap Act (18 U.S.C. § 2520(c)(2)), the VPPA (18 U.S.C. § 2710(c)(2)), and the CDAFA (Cal. Penal Code § 502(e)). Statutory-damages remedies for the intangible privacy injuries of the kind asserted here independently confer Article III standing under *TransUnion* and its progeny.

49. Nothing in Section 230 of the Communications Decency Act, 47 U.S.C. § 230, immunizes any of the conduct alleged here. Section 230 protects interactive computer service providers from being treated as the publishers or speakers of third-party content. Plaintiffs do not seek to hold Defendant liable as publishers or speakers of third-party content; they seek to hold Defendant liable for its own first-party conduct in designing, configuring, and operating Samsung Smart TVs and the ACR systems embedded therein, capturing and re-distributing Plaintiffs' in-home audiovisual viewing communications and associated identifiers, and doing so without informed consent and in violation of federal and California law. The Ninth Circuit has repeatedly held that § 230 does not immunize defendants from liability for their own first-party data-collection and data-disclosure conduct.

## V. SAMSUNG'S SMART TV BUSINESS

50. Samsung sells Smart TVs in the United States under the Samsung brand, including its Crystal UHD, Neo QLED, OLED, and The Frame product lines, and has maintained the number one position in global television sales every year since 2006. On information and belief, there are more than 73 million Samsung Smart TVs in use in the United States, and Samsung televisions account for roughly one-third of the U.S. Smart TV installed base.

51. Defendant's Smart TVs are internet-connected devices capable of running streaming applications, connecting to external media devices, and interacting with other smart devices within a consumer's home.

52. Samsung markets these televisions as convenient, centralized platforms for accessing digital media and streaming services.

53. Samsung sells millions of Smart TVs in the United States each year and has placed such devices in millions of American households.

54. Because televisions are typically located in shared household spaces—such as living rooms and bedrooms—a single Samsung Smart TV is regularly used by multiple individuals within a household, including family members and guests.

55. As a result, each Samsung Smart TV provides Samsung with access to detailed behavioral and viewing information concerning multiple individuals within the same household.

56. This household-level surveillance allows Samsung to collect and monetize viewing data not only from the purchaser of the television, but from all individuals who use it—regardless of whether those individuals received notice of or consented to such data collection.

## VI. AUTOMATIC CONTENT RECOGNITION TECHNOLOGY

57. Automatic Content Recognition ("ACR") is a technology designed to identify what media content is displayed on a television.

58. ACR operates by continuously capturing portions of the audio and video output from the television and converting those fragments into unique digital "fingerprints."

59. The identified viewing data is then transmitted to remote servers, where it is aggregated, analyzed, and linked to device- and household-level identifiers.




**Figure 1: Overview of ACR tracking in Smart TVs**

*Source*: Gianluca Anselmi et al., *Watching TV with the Second-Party: A First Look at Automatic Content Recognition Tracking in Smart TVs* (Sept. 10, 2024), arxiv.org/html/2409.06203v1.

60. Federal regulators have likewise long recognized the deceptive and unfair nature of undisclosed ACR data collection. In February 2017, the Federal Trade Commission and the New Jersey Attorney General announced a $2.2 million settlement with Vizio, Inc. arising from Vizio's collection of viewing data on approximately 11 million Vizio Smart TVs through ACR technology without consumers' informed consent. *See United States v. VIZIO, Inc.*, No. 2:17-cv-00758 (D.N.J.). The FTC found that Vizio used the ACR data to build "highly specific viewing-behavior databases" and shared those databases with third parties for advertising and analytics purposes. By 2021, public reporting indicated that Vizio earned more in profit from the sale of ACR-derived viewer data than from the sale of its televisions themselves. Defendant's ACR practices are materially the same as the practices for which Vizio was sanctioned, and Defendant's business model—selling televisions at competitive prices and recouping margin through the monetization of

consumer ACR data—is the same business model that the FTC and the New Jersey Attorney General determined to be unlawful and unfair.

**VII. SAMSUNG'S ACR SURVEILLANCE PROGRAM**

61. Samsung has incorporated ACR technology into its Smart TVs since at least 2013. Samsung's early ACR deployments were vendor-assisted: in November 2012, Samsung and Yahoo! Inc. announced a multi-year partnership to deploy Yahoo's "Broadcast Interactivity" platform—powered by Yahoo's SoundPrint ACR technology—within Samsung's SyncPlus platform and future Samsung televisions. SoundPrint was developed by IntoNow, Inc., a Palo Alto, California startup that Yahoo acquired in 2011. Samsung also integrated ACR technology from Enswers, Inc., a content-recognition company in which Samsung's venture arm invested in 2014. Not long afterward, Samsung built its own in-house, proprietary ACR system, operated in connection with its Samsung Ads advertising business, which it has run on Samsung Smart TVs ever since. When enabled, Samsung's ACR system captures audio and video data from the television screen approximately every 500 milliseconds—roughly twice every second.

62. Defendant implements this ACR functionality through Samsung's own proprietary ACR software and firmware on Samsung Smart TVs. Samsung Smart TVs run Samsung's Tizen operating system. The ACR system continuously captures fingerprints of the audiovisual content displayed on the screen—covering content from antenna and cable sources, HDMI inputs, and streaming applications—transmits those fingerprints to servers controlled by Defendant in real time and near-real time, matches them against a reference database to identify the specific content viewed, and associates that viewing activity with persistent identifiers tied to the television and household. In addition, Samsung Smart TVs running Tizen are configured to transmit to Google, in real time, the device's Google Advertising Identifier, signed-in Google account activity, application telemetry, and household and device identifiers, which Google incorporates into its identity- and audience-resolution infrastructure.

63. Within Samsung Smart TVs, this ACR functionality is presented to consumers during device setup and in subsequent menus under the deceptively innocuous label "Viewing

Information Services"—non-intuitive nomenclature that does not put a reasonable consumer on notice of what the feature actually does.

64. Samsung's own support documentation confirms the scope of this program. Samsung's Smart TV ACR FAQ states that, when Viewing Information Services is enabled, ACR technology generates unique signatures of the content displayed on the screen and may capture the consumer's viewing history, Smart TV identifiers—including Samsung's "Personalized Service ID" ("PSID")—and IP address, and states that this description applies to all Samsung Smart TVs manufactured by Samsung. Although Samsung characterizes the PSID as resettable, it functions as a persistent identifier in practice: it is linked to the household's accumulated viewing history, few consumers ever locate or reset it, and third-party applications on Samsung Smart TVs receive a derivative of it—the "Tizen Identifier for Advertising"—for ad targeting.

65. Samsung Ads likewise markets its ACR data to advertisers as "glass-level" content recognition—capturing what appears on the glass of the screen itself—from linear television, over-the-top streaming, set-top boxes, and gaming environments.

66. Samsung describes this feature as providing personalization, recommendations, or enhanced viewing experiences.

67. In reality, the feature operates as a continuous surveillance mechanism that monitors and records the media displayed on the television.

68. When enabled, Defendant's ACR system continuously captures audio and video data from the television screen during ordinary use.

69. The system identifies the content being displayed and records detailed information about each viewing session.

70. This data includes, but is not limited to:

a. the specific programs and videos watched;

b. the advertisements viewed;

c. the applications used;

d. the timing and duration of viewing sessions; and

e. information about devices connected to the television.

71. Samsung aggregates this data to create household-level viewing profiles.

72. These profiles are used by Samsung and its advertising partners to deliver targeted advertising across televisions and other connected devices.

## VIII. SAMSUNG'S COLLECTION OF HIGHLY SENSITIVE VIEWING DATA

73. The viewing information captured through Defendant's ACR system is highly sensitive and revealing.

74. For example, viewing behavior can reveal information relating to:

a. political preferences and affiliations;

b. religious beliefs and practices;

c. sexual orientation;

d. health conditions and medical concerns;

e. family composition, including the presence and ages of children; and

f. age, socioeconomic status, and other demographic characteristics.

75. Samsung aggregates this viewing data into consumer profiles used for targeted advertising and behavioral segmentation.

76. These profiles are linked to persistent identifiers and are associated with identifiers tied to other devices belonging to the same individual or household.

77. Through this linkage, Samsung correlates viewing activity from Smart TVs with data collected from smartphones, tablets, and computers.

78. This cross-device tracking enables Samsung and its advertising partners to construct detailed identity graphs and comprehensive behavioral profiles of consumers across contexts and devices.

79. The Sensitive Information collected and derived through Defendant's ACR data-collection conduct alleged in this Complaint thus includes, but is not limited to: (i) the specific audiovisual content displayed on Plaintiffs' and Class Members' Samsung Smart TVs, including the programs, episodes, advertisements, applications, and external-input content (e.g., from HDMI-

connected gaming consoles, Blu-ray players, streaming sticks, and personal computers) viewed; (ii) device-level and network identifiers tied to those Samsung Smart TVs, including IP address, MAC address, advertising identifier, household identifier, and operating-system identifier; (iii) cross-device identifiers and linkages associating those Samsung Smart TVs with other devices used in the same household or by the same individual user (including smartphones, tablets, and computers); (iv) timestamped logs of viewing activity and device usage; and (v) inferences drawn from the foregoing, including inferences regarding consumers' interests, habits, preferences, household composition, demographics, lifestyle, and other personal characteristics.

## IX. SAMSUNG'S INTEGRATED ACR SURVEILLANCE ARCHITECTURE

80. Defendant's Samsung Smart TVs and the ACR and identity-resolution platform of downstream third-party recipients operate together as an integrated surveillance and advertising architecture designed to capture, identify, and monetize consumers' in-home viewing activity.

81. Defendant matches the ACR fingerprints captured from Samsung Smart TVs to identify the viewed content and associate that information with device- and household-level identifiers, including IP address, MAC address, and advertising identifier, transmitting the resulting viewing data to servers controlled by Defendant. On information and belief, downstream advertising, measurement, and identity-resolution partners receive, in real time, the device's advertising identifier, signed-in account activity, application telemetry, and household and device identifiers, which downstream identity-resolution partners associate with their identity graph. The ACR transmissions and associated identifier transmissions include content- and identifier-derived information sufficient to identify the specific programs, advertisements, or audiovisual material viewed by Plaintiffs and Class Members and to attribute that viewing activity to particular households and devices in real time or near-real time.

82. Each of those operators integrates the captured ACR data into broader identity-resolution systems that link Samsung Smart TVs to other devices associated with the same household or user, including smartphones, tablets, and computers, using deterministic and

probabilistic matching techniques and identifiers obtained from third-party identity-resolution providers (such as LiveRamp), and demand-side and supply-side platforms.

83. Through these systems, Defendant and the third-party recipients create cross-device identity graphs that connect in-home television viewing activity with digital activity occurring on other devices and platforms, forming unified profiles that persist over time and are updated as additional data is collected. This process results in the assignment or maintenance of persistent identifiers—whether internally defined or derived from combined signals—that function as stable reference points for tracking a household or user across devices and over time.

84. The Samsung Smart TV serves as a primary data-collection endpoint—and the anchor of this identity-resolution architecture—capturing viewing activity from the "first screen" in the home. In sequence, Defendant and downstream third-party recipients (1) capture viewing data on the device, (2) convert it into identifiable signals, (3) transmit those signals to servers controlled by Defendant in real time or near-real time, (4) match them to known content, (5) associate them with persistent identifiers, including IP address, MAC address, advertising identifiers, and Samsung's PSID, (6) incorporate them into identity graphs used for advertising and analytics, and (7) re-distribute the resulting datasets to other downstream ad-tech, identity-graph, data-broker, and measurement partners as alleged herein.

85. Recent academic forensics support the existence and operational behavior of these data flows. In a 2024 ACM Internet Measurement Conference paper, researchers performed a black-box audit of the ACR network traffic generated by Smart TVs and confirmed that ACR-enabled Smart TVs continuously capture content displayed on the screen, generate fingerprints of that content, and transmit those fingerprints to ACR-vendor-controlled domains. They further found that ACR transmissions occurred even when the Smart TV was used as a "dumb" HDMI display for laptops, gaming consoles, and other personal devices, and that opting out of ACR features through the Smart TV's privacy menus stopped or substantially reduced network traffic to ACR-vendor servers. The architectural pattern that research documents—continuous on-device fingerprint generation; transmission to vendor-controlled servers; input-source-agnostic capture,

including for HDMI sources—is the same architectural pattern that Defendant and downstream third-party recipients employ on Samsung Smart TVs. Samsung Smart TVs transmit ACR fingerprints and associated identifiers to Defendant- and downstream third-party recipients-controlled server endpoints in real time and near-real time during use. Plaintiffs reserve the right to identify the specific endpoints in discovery.

## X. DEFENDANT'S REAL-TIME AND NEAR-REAL-TIME DISCLOSURE OF ACR DATA TO THIRD-PARTY RECIPIENTS

86. Defendant discloses ACR-derived Sensitive Information through several channels documented by Samsung itself. First, Samsung Ads has integrated the identity and audience data of Experian—a consumer credit-reporting and data company—into Samsung's demand-side platform ("DSP"), announcing in December 2023 that Experian's identity data, built on approximately 128 million households and 750 million hashed emails, would be matched with Samsung's data to power audience targeting. On information and belief, that integration necessarily involves the exchange of household- and device-level identifiers between Defendant's ACR-derived data and Experian.

87. Second, Samsung Ads provides advertisers access to curated audiences through data-management and identity partners that, per industry reporting of Samsung Ads' own disclosures, include Acxiom, Adobe, Experian, LiveRamp, Merkle, and Oracle. On information and belief, activating ACR-derived audiences through those partners involves the transmission of identifiers and audience-membership data to them.

88. Third, Samsung's DSP documentation—including its Campaign Exposure, Audience Profiling, and Linear Ads materials—confirms that household-level viewership and ad-exposure data derived from ACR is made available to DSP buyers and advertisers. Samsung Ads has likewise licensed Nielsen's Digital Ad Ratings measurement for its advertising inventory, and Samsung Ads' own Privacy Notice states that Samsung shares information with its "subsidiaries, affiliates, service providers, and business partners"—each a corporate person separate from Defendant.

89. Fourth, as the State of Texas alleged in its enforcement action, Samsung shares consumers' viewing data with demand-side platforms, ad networks, measurement companies, data brokers, and cross-device-graphing companies—an allegation grounded in Samsung's own DSP documentation.

90. Samsung's restrictiveness with the raw ACR data underscores its value: unlike certain competitors, Samsung declines to license its raw ACR data broadly, instead retaining it as a proprietary asset that powers Samsung Ads' advertising business across the largest Smart TV fleet in the United States. The commercial value Samsung extracts from Plaintiffs' viewing data—while disclosing ACR-derived Sensitive Information through the channels described above—is central to Plaintiffs' unjust-enrichment and economic-injury allegations.

91. Each such recipient's receipt and use of ACR data from Samsung Smart TVs makes it a separate, third-party recipient of consumers' viewing communications, distinct from Samsung Electronics America, Inc. Defendant's manufacture, sale, configuration, ongoing software support, and operation of the ACR system on Samsung Smart TVs are what enable that receipt and use.

92. **Other ad-tech, data-broker, identity-resolution, and measurement partners.** On information and belief, Defendant's ACR data is further made available to additional downstream identity-resolution, measurement, and advertising partners—on information and belief including LiveRamp—in connection with audience activation and campaign measurement, measurement and attribution providers (such as The Nielsen Company), demand-side and supply-side platforms (such as The Trade Desk, Inc.), real-time bidding exchanges, and other ad-tech ecosystem participants. Plaintiffs reserve the right to identify additional third-party recipients in discovery**.**

## XI. SAMSUNG'S MARKETING AND REPRESENTATIONS REGARDING SMART TV FUNCTIONALITY AND PRIVACY

93. Samsung markets its Smart TVs as premium entertainment devices designed to provide consumers with seamless access to content and a personalized viewing experience.

94. In its marketing materials and user-facing disclosures, Samsung represents that features such as “Viewing Information Services” or “personalized recommendations” enhance the user experience by tailoring content suggestions to the viewer.

95. Samsung promotes these features as tools that help users discover content, enhance viewing, and personalize their entertainment experience.

96. These representations convey to reasonable consumers that any data collection associated with such features is limited, user-beneficial, and tied to improving on-screen recommendations.

97. Samsung does not disclose in its marketing materials that these features function by continuously capturing and analyzing the audio and video displayed on the television screen, including content viewed through third-party applications and external devices.

98. Nor does Samsung disclose that this viewing data is transmitted to third parties, including advertising and data analytics companies, for purposes unrelated to providing core television functionality.

99. Samsung further fails to disclose that the data collected through ACR is used to construct cross-device identity profiles and to facilitate targeted advertising across multiple devices and platforms.

100. To the extent Samsung provides disclosures regarding data collection, such disclosures are incomplete, obscured, and presented, if at all, during initial device setup—often to a different individual than the end users of the television.

101. Samsung’s marketing and disclosures omit the facts a reasonable consumer would need to understand what these “personalization” features actually do. Without those facts, Samsung’s representations about personalization and user control are misleading.

102. Reasonable consumers, including Plaintiffs, would not expect that simply watching television in their homes would result in the continuous interception, analysis, and disclosure of their viewing activity and associated identifiers to third parties.

103. Had Plaintiffs known the true nature and scope of Defendant's data collection and sharing practices, they would not have purchased their Samsung Smart TVs or would have paid substantially less for them.

104. The circumstances of Defendant's misrepresentations and omissions are as follows:

a) Defendant—which controls and disseminates the United States–facing marketing, packaging, and on-device setup screens—represented at the point of sale, and again during the initial device setup for the model years at issue, that its Smart TVs and their associated features enhance the viewing experience, describing those features with the benign labels identified above—most prominently "Viewing Information Services"—and affirmatively representing in its Viewing Information Services notice that "Samsung neither collects any video footage nor any content displayed on the Device."

b) Defendant conveyed those representations on the product packaging and marketing and through the on-device setup screens presented to Plaintiffs on their Samsung Smart TVs, and continued to convey them throughout each Plaintiff's ownership and use.

c) The representations were misleading because Defendant simultaneously concealed the material fact that these features operate as continuous ACR surveillance that captures the audiovisual content displayed on the screen approximately every 500 milliseconds, fingerprints it, and discloses it to third parties, together with persistent identifiers tied to the household and device.

d) Nowhere did Defendant identify or explain the ACR functionality, disclose that every image and sound displayed on the screen would be intercepted and disclosed to third parties for commercial exploitation, or afford consumers a meaningful opportunity to decline.

e) As a result, a reasonable consumer—including each Plaintiff—would not have understood that purchasing and using the Samsung Smart TV subjected his or her viewing activity to continuous interception and disclosure.

## XII. SAMSUNG PURPORTS TO OBTAIN—BUT DOES NOT ACTUALLY OBTAIN—CONSUMER CONSENT THROUGH DECEPTIVE DESIGN.

105. Samsung does not meaningfully disclose its ACR surveillance practices to consumers.

106. Instead, Samsung presents the ACR feature during the television setup process using misleading terminology and opaque disclosures.

107. For example, Samsung labels the ACR feature "Viewing Information Services," a name that does not disclose, and gives rise to no reasonable inference of, the continuous, real-time capture of the sounds and images displayed on the consumer's screen approximately every 500 milliseconds.

108. Samsung's Viewing Information Services notice goes further and affirmatively misrepresents how the feature operates, telling consumers that "Samsung neither collects any video footage nor any content displayed on the Device." That representation is false. The ACR system on Samsung Smart TVs operates precisely by capturing the content displayed on the device, fingerprinting it, and transmitting those fingerprints for matching and monetization.

109. Samsung has long known that its content-recognition features capture and transmit the content displayed on its televisions. Samsung's own SmartTV privacy supplement disclosed—in fine print—that when SyncPlus or similar interactive-marketing features were enabled, Samsung provided "video or audio snippets" of the program being watched to third-party providers, which could also receive the consumer's IP address, device identifiers, and interaction data. Samsung's representation that it "neither collects any video footage nor any content displayed on the Device" was therefore not merely false, but knowingly false.

110. During the setup process, consumers are required to navigate through multiple screens before reaching a consent screen.

111. Most consumers click through the screenflow simply to complete the setup process and begin using the television.

112. Samsung intentionally presents its privacy policies during the initial setup process when consumers are most eager to begin using their new televisions.

113. During initial setup, Samsung presents consumers with a single consent screen that bundles multiple separate notices—including the Smart Hub U.S. Privacy Notice, Viewing Information Services, and the Interest-Based Advertisements Service U.S. Privacy Notice—dominated by one prominently displayed button: "I Agree to all." Most consumers press "I Agree to all" simply to finish setting up their new television and begin using it.

114. Samsung's own instructional materials reinforce this one-click enrollment design. The official "Samsung Care" YouTube channel's television set-up video directs users to "review and *agree to all* the SmartHub terms and conditions and select OK." (emphasis added). The video is available at https://www.youtube.com/watch?v=C3Fi7glcMNo.

115. Defendant's disclosures fail to explain that enabling the Viewing Information Services feature allows Samsung to continuously capture and analyze the audio and video displayed on the television screen.

116. Samsung also fails to disclose that the resulting viewing data will be used to create advertising profiles or identity graphs and shared with advertising partners.

117. Even after setup, consumers who wish to disable the surveillance must locate and disable at least two separate settings—Viewing Information Services and Interest-Based Advertisements—scattered across different parts of the settings menus, a non-intuitive path requiring approximately fifteen or more clicks. Samsung provides no visual indicator—no light, icon, or message—that ACR is actively capturing the screen.

118. This design—easy opt-in combined with difficult opt-out—is a well-known manipulative interface technique commonly referred to as a "dark pattern."

119. As a result, millions of consumers have unknowingly enabled Defendant's ACR surveillance.

120. The State of Texas reached the same conclusions about Samsung's consent architecture. On December 15, 2025, the Texas Attorney General filed a verified petition against Defendant, State of Texas v. Samsung Electronics America, Inc., Cause No. 380-09751-2025 (380th Jud. Dist. Ct., Collin County, Texas), alleging that Samsung's ACR data-collection program violated the Texas Deceptive Trade Practices Act because, among other things, Samsung deceptively named the program "Viewing Information Services," bundled its consent requests behind a single "I Agree to all" button, represented that it "neither collects any video footage nor any content displayed on the Device," and scattered opt-out controls across multiple menus.

121. On February 27, 2026, the court entered an Agreed Final Judgment and Permanent Injunction resolving the Texas action. Under that injunction, Samsung may not collect or process viewing data without consumers' "Affirmative Express Consent," was required within 30 days to update its model-year 2025 onboarding consent screens to include a clear and conspicuous summary of its use of viewing data—including language substantially similar to "Viewing Information Services uses Automatic Content Recognition technology to identify and analyze content on your device"—and was required within 180 days to present the Viewing Information Services notice on a standalone screen, separate and apart from any privacy notice or terms of service, for model-year 2026 and later models.

122. The remediation that injunction mandates identifies precisely what was missing from Samsung's consent flows: a clear, conspicuous, standalone disclosure that "Viewing Information Services" is ACR surveillance. Those disclosures were absent from the consent flows presented to Plaintiffs and Class Members throughout the Class Period.

123. On information and belief, Defendant has not extended equivalent disclosures or consent protections to California consumers for the periods at issue in this action.

## XIII. PLAINTIFFS AND CLASS MEMBERS HAD A REASONABLE EXPECTATION OF PRIVACY.

124. Plaintiffs and Class Members had a reasonable expectation that their television-viewing activity, and the contents of their private communications with and through their Samsung Smart TVs, would remain private. Consumers do not expect to be tracked across every one of their internet-connected devices—their televisions, tablets, computers, and phones—by Samsung's advertising business and by downstream identity-resolution, data, and measurement companies they have never heard of. And although consumers know Samsung as a television manufacturer, no reasonable consumer expected that watching television at home would feed cross-device advertising profiles assembled by Samsung Ads and its partners.

125. This expectation is reflected in the privacy-protective measures consumers have widely adopted. After Apple introduced controls allowing consumers to prevent the collection of their mobile advertising identifiers, the overwhelming majority of users invoked them—one 2021 analysis found that 88% of iOS users worldwide had done so—demonstrating consumers' intent not to be tracked.

126. Plaintiffs and Class Members did not know, and did not expect, that the technology embedded in their Samsung Smart TVs was secretly intercepting their identifiable viewing activity, or that this activity would be assigned a persistent, unique identifier and incorporated into cross-device profiles used and sold for targeted advertising. They reasonably expected that they would not be surveilled in their own homes by companies unknown to them—and, as to Samsung itself, in ways no reasonable consumer expected, let alone that their identifiable viewing history would be marketed to third parties for profit.

127. The privacy interest in one's own video-viewing history is long recognized. Congress enacted the Video Privacy Protection Act to protect it, after a newspaper published a profile of Judge Robert H. Bork derived from the films his family had rented—prompting Senator Alan Simpson to warn that "it is nobody's business" what a person watches at home and that the aggregation of such records "really is Big Brother." What a person chooses to watch in the privacy

of the home reveals that person's interests, beliefs, and intimate characteristics, and is information a reasonable person expects to keep private.

128. Although the VPPA was originally intended to protect the privacy of an individual's rental videotape selections, Congress has repeatedly reiterated that the VPPA is applicable to "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.

## XIV. SAMSUNG PROFITS FROM ITS SURVEILLANCE OF CONSUMERS.

### A. Samsung Derived Significant Benefits from Its Collection and Use of Plaintiffs' and Class Members' Sensitive Information.

129. The viewing data collected through Defendant's ACR system is highly valuable in the digital advertising marketplace.

130. By collecting, analyzing, and monetizing this data, Samsung generates significant revenue through advertising, audience segmentation, and analytics services.

131. The data collected through Defendant's ACR Tools is used to build household-level and cross-device identity profiles, which are then leveraged to enable targeted advertising across televisions, mobile devices, and computers.

132. These practices allow Samsung and its partners to deliver highly targeted advertisements, measure advertising effectiveness, and sell access to valuable audience segments.

133. As a direct result of its surreptitious collection, use, and disclosure of Plaintiffs' and Class Members' Sensitive Information, Samsung has generated, and continues to generate, substantial revenue attributable to its data-driven advertising and analytics operations.

134. Through these practices, Samsung has been unjustly enriched at the expense of Plaintiffs and Class Members, whose private viewing information was collected and monetized without their knowledge or informed consent.

### B. Plaintiffs' and Class Members' Data Had Independent Financial Value.

135. Plaintiffs' and Class Members' Sensitive Information has independent economic value in the marketplace for consumer data.

136. Industry data confirms that consumer data has substantial and increasing per-user value, as reflected in growing revenues from targeted advertising and the existence of programs in which companies compensate consumers in exchange for access to their behavioral data, demonstrating that such information is a recognized and tradable asset.

137. There is an active, established market for precisely the type of data Defendant and downstream third-party recipients collect from Samsung Smart TVs. Advertisers spent more than $18.6 billion on Smart TV advertising in 2022 alone, and viewing data accompanied by IP addresses—like the data intercepted here—is bought and sold every day.

138. The market price for this data is substantial and specific. Advertisers and publishers can purchase United States residents' connected-television viewership data—listing the consumer's IP address, location, and the title of the video they viewed—for $14,850 per month, or $148,500 per year. The existence of this supply side and sell side confirms that Plaintiffs' and Class Members' identifiable viewing data has objective, ascertainable monetary value.

139. Companies routinely pay for access to user-level behavioral data, including browsing activity, viewing habits, and device-level identifiers, because such data enables precise targeting and profiling. For example, several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

140. If given the choice, each Plaintiff could have sold or licensed their valuable Sensitive Information to Samsung or its partners for monetary compensation, but they were not given that choice. By contrast, Samsung obtained Plaintiffs' and Class Members' Sensitive Information without compensation and without informed consent, while retaining the full economic benefit of that data.

141. The unauthorized interception and disclosure of Plaintiffs' and Class Members' Sensitive Information diminished the value of that information and deprived them of the ability to control, license, or otherwise monetize their own data.

142. As a result, Plaintiffs and Class Members have suffered economic harm.

## XV. SAMSUNG'S USE OF THE ACR TOOLS VIOLATES STATE AND FEDERAL DATA PRIVACY LAWS.

### A. The Video Privacy Protection Act (VPPA)

143. The VPPA was enacted in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

144. Congress was particularly concerned with the privacy of individuals' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

145. Although originally enacted in the context of videotape rentals, Congress has made clear that the VPPA applies to modern technologies, including "'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[1]

146. The VPPA prohibits a "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b).

---

[1] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

147. The statute defines a "video tape service provider" as any person "engaged in the business… of rental, sale, or delivery of… similar audio visual materials." 18 U.S.C. § 2710(a)(4).

148. It further defines "personally identifiable information" ("PII") as information that identifies a person as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(a)(3).

149. Samsung is a "video tape service provider" within the meaning of the VPPA because it is engaged in the business of delivering video content to consumers, including through its Smart TV platform, which provides access to on-demand streaming services and Defendant's own curated video-content offerings.

150. As alleged herein, Samsung, through its ACR Tools, knowingly intercepts and discloses consumers' video-viewing activity—including the specific programs and content viewed—along with persistent identifiers such as IP addresses, device identifiers, and other data that enable those viewing selections to be associated with a particular individual or household.

151. These disclosures constitute the disclosure of "personally identifiable information" under the VPPA because they identify consumers as having requested or obtained specific video materials or services.

152. Samsung makes these disclosures to third parties, including advertising and analytics partners, for commercial purposes, including targeted advertising, audience segmentation, and measurement.

153. Samsung does so without obtaining consumers' informed, written consent in a form that is distinct and separate from other terms, and, in many cases, without providing any disclosure to the actual users of the television whose viewing activity is collected and disclosed.

154. Courts have recognized that the VPPA applies to modern streaming technologies and evolving forms of audiovisual content delivery. *See, e.g., Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used

'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

### B. The Federal Trade Commission Act ("FTC Act")

155. The Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Federal Trade Commission ("FTC") is charged with enforcing that prohibition, and its standards define the contours of unfair and deceptive conduct in the marketplace, including in the collection, use, and disclosure of consumers' personal information.

156. An act or practice is deceptive under the FTC Act where it involves a representation, omission, or practice that is material and likely to mislead a consumer acting reasonably under the circumstances. A failure to disclose material information—including the existence, scope, and operation of data-collection practices that a reasonable consumer would not expect—is actionable as a deceptive omission.

157. An act or practice is unfair under the FTC Act where it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). The surreptitious collection and disclosure of consumers' private television-viewing activity inflicts precisely such substantial injury, which consumers cannot reasonably avoid because the conduct is concealed and enabled by default, and which is not outweighed by any countervailing benefit.

158. The FTC has applied these standards directly to Smart TV ACR data collection. In its 2017 enforcement action against Vizio, the FTC alleged that the undisclosed, default collection of consumers' second-by-second television-viewing data, and its association with persistent identifiers and demographic information for sale to third parties, constituted both an unfair and a deceptive practice under Section 5. That action confirms that the conduct Samsung engages in here—the undisclosed, ongoing capture and disclosure of viewing activity tied to persistent identifiers—falls squarely within the unfair and deceptive practices the FTC Act prohibits.

159. Samsung represents its Smart TVs and their associated features—including the "Viewing Information Services," content personalization, and program-recommendation functionality—as benefits designed to enhance the viewer's experience. Samsung markets these televisions as ordinary consumer-electronics products and does not represent them as instruments of continuous surveillance.

160. These representations are materially misleading because Samsung fails to disclose that the same features operate by continuously capturing, fingerprinting, and analyzing the audio and video displayed on the screen—including content viewed through third-party applications, broadcast signals, and external devices connected via HDMI—on a second-by-second basis and without regard to the source of the content.

161. Samsung further fails to disclose that the resulting viewing data is transmitted, in real time and near-real time, to third parties—on information and belief including downstream advertising, measurement, and identity-resolution partners—and is used to construct cross-device and household identity profiles for targeted advertising and other commercial purposes. A reasonable consumer purchasing and setting up a television would neither expect, nor be informed, that ordinary use of the device subjects every program watched to interception and disclosure.

162. The omitted information is material: a reasonable consumer's decision to purchase a Samsung Smart TV, to use its features, or to take steps to limit data collection would be affected by disclosure that the device continuously records and discloses what is watched on it. Samsung's failure to disclose these practices, while continuing to collect, transmit, and monetize consumers' viewing activity without informed consent, constitutes an unfair and deceptive act or practice.

## XVI. CLASS ALLEGATIONS

163. "Class Period" means the period beginning January 1, 2013—the earliest date on which, on information and belief, Defendant deployed automatic content recognition technology on Samsung Smart TVs sold in the United States—and continuing through the date of class certification. Because Defendant's interceptions, recordings, uses, and disclosures of Class Members' Sensitive Information are continuing and separately accruing, and because the applicable

limitations periods have been tolled and Defendant is estopped from asserting them for the reasons set forth in the Tolling and Estoppel section below, the Class Period encompasses conduct predating the limitations periods that would otherwise apply. Plaintiffs reserve the right to seek certification of a Class Period of different scope as the evidence warrants.

164. This action is brought by the named Plaintiffs both individually, and on behalf of the following Classes and Subclasses under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4):

**Nationwide ACR Class**: All natural persons in the United States who, during the Class Period, used a Samsung Smart TV on which ACR technology was enabled and that captured, analyzed, or transmitted information regarding audiovisual content displayed on the device.

**California ACR Subclass**: All members of the Nationwide ACR Class who reside in California.

**Nationwide Identity Graph Class**: All natural persons in the United States whose Samsung Smart TV viewing data was associated, matched, or combined, by or at the direction of Defendant—including through Defendant's demand-side platform or its data-partner integrations—with individual- or household-level identity data during the Class Period.

**California Identity Graph Subclass**: All members of the Nationwide Identity Graph Class who reside in California.

165. The Nationwide ACR Class and the Nationwide Identity Graph Class are collectively referred to as the "Nationwide Classes." The California ACR Subclass and the California Identity Graph Subclass are collectively referred to as the "California Subclasses." The Nationwide Classes and the California Subclasses defined above are collectively referred to herein as the "Class."

166. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which any Defendant has a controlling interest, as well as their officers, directors,

affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

167. Plaintiffs reserve the right to amend the definitions of the Class or add or refine Subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified, including based on the identification of additional ACR providers, identity-graph operators, or other downstream recipients of Samsung ACR data in discovery.

168. **<u>Numerosity</u>**. The Class is so numerous that the individual joinder of all members is impracticable. There are at least 100,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

169. **<u>Commonality</u>**. Common questions of law and fact arise from Defendant's uniform conduct and are capable of classwide resolution. These common questions predominate over any questions affecting only individual Class Members and include, without limitation:

a) Whether Defendant's ACR-enabled collection, interception, and disclosure of Sensitive Information occurred in a substantially similar manner for all Class Members;

b) Whether Defendant collected, transmitted, and disclosed Class Members' Sensitive Information—including video-viewing activity and associated identifiers—to third parties without adequate notice or consent;

c) Whether Defendant's disclosures, if any, regarding its data collection and sharing practices were misleading, incomplete, or insufficient to obtain informed consent;

d) Whether Defendant and its partners used persistent identifiers to link Class Members' viewing activity across devices and to create cross-device identity profiles;

e) Whether Defendant had a duty to refrain from collecting, intercepting, or disclosing Class Members' Sensitive Information without authorization;

f) Whether Defendant's conduct constitutes an unlawful interception, disclosure, or use of Sensitive Information under the statutes asserted herein, including but not limited to the

Video Privacy Protection Act;

g) Whether the information disclosed by Defendant constitutes "personally identifiable information" or otherwise protected information under applicable law;

h) Whether Defendant's conduct was unfair, unlawful, or deceptive;

i) Whether Defendant was unjustly enriched by its collection and monetization of Class Members' Sensitive Information;

j) Whether Class Members suffered injury, including invasion of privacy and loss of control over their Sensitive Information, as a result of Defendant's conduct;

k) Whether Defendant's conduct entitles Plaintiffs and Class Members to statutory, actual, nominal, and/or punitive damages; and

l) Whether injunctive or declaratory relief is warranted to prevent Defendant's ongoing collection, use, and disclosure of Class Members' Sensitive Information.

170. **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the ACR Tools.

171. **Adequacy**. Plaintiffs will fairly and adequately represent and protect interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

172. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the same categories of third-party recipients, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

173. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

174. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

175. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant made uniform misrepresentations—including that Samsung "neither collects any video footage nor any content displayed on the Device"—and uniformly failed to disclose the ACR surveillance described herein;

b) Whether the ACR system on Samsung Smart TVs uniformly captured, fingerprinted, and transmitted the content displayed on Class Members' screens approximately every 500 milliseconds;

c) Whether Samsung's standardized onboarding screens—culminating in a single "I Agree to all" button—were capable of obtaining, and did obtain, valid informed consent;

d) Whether Defendant disclosed ACR-derived viewing data and associated identifiers to third parties, including identity-resolution, data, and measurement partners, without

Class Members' consent;

e) Whether Defendant's conduct violated the California Invasion of Privacy Act, the federal Wiretap Act, the Video Privacy Protection Act, the Comprehensive Computer Data Access and Fraud Act, the Unfair Competition Law, and the Consumers Legal Remedies Act, and invaded Class Members' privacy under California common and constitutional law;

f) Whether Class Members are entitled to damages, restitution, and injunctive relief—including a public injunction on behalf of the general public—and the proper measure of that relief.

176. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## XVII. TOLLING AND ESTOPPEL

177. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation and operation of ACR technology and related data-collection and transmission systems on Samsung Smart TVs. Samsung's concealment included the innocuous "Viewing Information Services" label, the absence of any on-screen indicator that the screen was being captured, and privacy notices affirmatively stating that Samsung does not collect the content displayed on the device.

178. The ACR systems on Samsung Smart TVs are, and at all relevant times have been, invisible to the average user and operate without any contemporaneous indication that audio or video content is being captured, analyzed, or transmitted, including because Defendant's conduct occurs at the device and server level and is not observable through ordinary use of the television. There is no on-screen indicator, recording light, transmission alert, or other visual cue that would alert a reasonable consumer that the Smart TV is, in real time, capturing fingerprints of every sound and image displayed on the screen and transmitting that data to remote servers operated by downstream third-party recipients, Defendant's affiliates, or other downstream recipients.

179. Defendant had exclusive knowledge that Samsung Smart TVs incorporated ACR technology and were configured to capture, process, and transmit content-derived data and associated identifiers to multiple separate third parties, on information and belief including downstream advertising and identity-resolution partners, yet failed to adequately disclose any of these practices to users, including Plaintiffs and Class Members.

180. Defendant further concealed the nature, scope, and consequences of these practices through misleading terminology, fragmented disclosures, and deceptive interface design, including (a) the use of the benign-sounding label "Viewing Information Services" (which does not, by its terms, identify any third party, identify ACR functionality, or convey that the feature operates as continuous frame-by-frame surveillance); (b) the bundling of multiple agreements during setup such that meaningful review of the ACR-related disclosure was practically impossible; and (c) the dispersion of opt-out controls across four or more separate menus requiring approximately fifteen or more clicks, which obscured the practices in operation at the time of each Plaintiff's purchase.

181. Under these circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection, use, and disclosure of users' Sensitive Information. To date, Defendant has not fully disclosed or acknowledged the extent to which it captured, identified, and transmitted users' viewing activity and associated identifiers to third parties such as downstream third-party recipients and Defendant's affiliates.

182. Accordingly, Defendant is estopped from relying on any statute of limitations.

183. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

184. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct (as alleged with specificity in this Complaint) was shortly before this action was filed, when independent forensic and academic analysis of Smart TV ACR network traffic, together with counsel's pre-suit investigation, first identified the specific ACR practices, third-party-disclosure pipelines, and deceptive labeling and dark-pattern consent architecture alleged herein. Prior to that time, no public source identified, by name and with the

specificity necessary to put a reasonable consumer on notice, Defendant's specific ACR practices, Defendant's specific third-party-disclosure pipelines, or Defendant's specific deceptive labeling and dark-pattern consent architecture.

185. Although prior reports suggested that certain smart televisions collected viewing data, those generic reports did not reveal the nature, scope, or recipients of Defendant's specific ACR-based interceptions. Defendant did not disclose that Samsung Smart TVs captured content displayed across all inputs—including HDMI-connected devices—or that such information was transmitted in real time and near-real time to multiple separate third parties such as other downstream recipients. These transmissions occurred through hidden background processes not visible to users and were only recently uncovered through forensic network analysis by independent academic researchers and counsel's pre-suit investigation. As a result, Plaintiffs and Class Members could not reasonably have discovered Defendant's unlawful conduct earlier through the exercise of reasonable diligence.

186. Defendant may contend that Plaintiffs were on inquiry notice based on (i) Defendant's own on-device terms, notices, or privacy policy; (ii) the 2024 Anselmi academic study; (iii) earlier consumer-press coverage of Smart TV data collection generally; (iv) a 2016 FTC workshop discussing ACR; (v) the Federal Trade Commission and New Jersey Attorney General's 2017 settlement with Vizio for similar Smart TV ACR conduct; or (vi) earlier consumer lawsuits concerning Smart TV data practices. None of those sources put a reasonable Samsung Smart TV owner on inquiry notice of the specific conduct alleged here. Defendant's own disclosures used misleading terminology that does not identify any third-party recipient or convey continuous ACR surveillance, and were buried behind dark-pattern consent flows. The 2024 Anselmi paper was published in a technical academic repository requiring network-analysis expertise to interpret and was not disseminated to consumers. The earlier consumer-press coverage and the 2016 FTC workshop addressed Smart TV manufacturers and ACR generally, did not name Samsung, and did not identify Defendant's specific ACR vendors (on information and belief, downstream ad-tech recipients) or third-party data recipients. The 2017 FTC—Vizio settlement involved a different

manufacturer and did not identify Samsung or Defendant's ACR vendors. None of these sources was a "storm warning" of consumer-side liability sufficient to commence the limitations period as a matter of California or federal law. Nor did earlier consumer litigation commence the limitations period: ordinary television owners are not charged with monitoring federal court dockets; the most prominent earlier lawsuit concerning Smart TV ACR practices was dismissed at the pleading stage in 2018—an outcome that would have communicated to any inquiring consumer that the practices, as then understood, were not unlawful—and the specific facts pleaded here, including the 500-millisecond capture rate, the falsity of the Viewing Information Services notice, and the identity-resolution architecture through which viewing data is matched to individuals, were not disclosed in that litigation. Moreover, throughout the years that followed, any consumer diligent enough to consult Samsung's own disclosures would have encountered Samsung's affirmative assurance that it "neither collects any video footage nor any content displayed on the Device"—a false assurance that both defeats inquiry notice and independently estops Defendant from asserting the statutes of limitations.

187. Beyond the discovery rule and equitable estoppel, Defendant's continuing course of conduct independently tolls the applicable limitations periods. Defendant's ACR system continues to capture, transmit, and re-distribute Plaintiffs' and Class Members' communications and personal identifiers in real time and near-real time, on every Samsung Smart TV in operation, to the present day. Each new audiovisual fingerprint captured, each new transmission of that fingerprint and associated persistent identifiers to Defendant or any downstream recipient, and each new re-disclosure or re-use of that data by Defendant or its downstream partners, is an independent and separately actionable violation that triggers a fresh limitations period, including under the federal Wiretap Act (each interception), CIPA §§ 631, 632, and 638.50–638.51 (each unauthorized interception or recording), the VPPA (each disclosure of personally identifiable viewing information), and the UCL (each unfair, unlawful, or fraudulent business act).

188. Independent of any tolling doctrine, each interception, recording, use, and disclosure alleged herein is a separate violation that accrues separately. Plaintiffs' and Class Members' claims

are therefore timely, at a minimum, as to every interception, recording, use, and disclosure occurring within the applicable limitations period preceding the filing of this action, and the federal Wiretap Act's limitations period runs from the date on which the claimant first has a reasonable opportunity to discover the violation. 18 U.S.C. § 2520(e).

## XVIII. CLAIMS FOR RELIEF

### COUNT I

### Invasion of Privacy – Intrusion Upon Seclusion

### (On Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

189. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

190. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation of privacy in their homes and in the audiovisual content they viewed on their televisions.

191. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

192. Defendant, through its Smart TVs and embedded ACR technology, intentionally intruded upon Plaintiffs' and Class Members' private affairs.

193. Specifically, Defendant's Smart TVs continuously monitored what appeared on the television screen by capturing audio and visual information from content displayed on the device.

194. Defendant's ACR system captured information reflecting Plaintiffs' viewing behavior, including the programs watched, the applications used, and the content displayed through external devices connected via HDMI.

195. By capturing and analyzing this information, Samsung intruded into Plaintiffs' private viewing activity within the home.

196. Defendant's conduct enabled it to construct detailed profiles of Plaintiffs' interests, habits, and personal characteristics based on viewing behavior.

197. These profiles included Sensitive Information reflecting Plaintiffs' preferences, beliefs, and lifestyle.

198. Samsung designed, implemented, and deployed ACR technology for the purpose of collecting and monetizing consumer viewing data.

199. Defendant's third-party ad-tech partners (on information and belief, downstream ad-tech recipients) used this data to identify the specific audiovisual content being viewed—including programs, episodes, advertisements, and other on-screen material—regardless of whether that content originated from streaming applications, broadcast signals, or HDMI-connected external devices. This content recognition occurred within seconds of display and operated continuously or at frequent intervals during device use, enabling those partners to track Plaintiffs' and Class Members' viewing activity as it occurred.

200. In connection with this conduct, those third-party recipients received and processed persistent identifiers associated with Plaintiffs' and Class Members' devices and households, including IP addresses, MAC addresses, advertising identifiers, household identifiers, and other unique or quasi-unique signals, and used these identifiers, together with additional data obtained from third-party partners (including identity-resolution providers and data brokers), to associate Plaintiffs' and Class Members' Smart TV activity with other devices and identities.

201. Through these practices, Defendant's third-party ad-tech partners constructed and maintained identity-resolution systems—commonly referred to as identity graphs—that linked Plaintiffs' and Class Members' televisions, mobile devices, computers, and other connected devices to a unified profile representing the household and its inferred members. Those identity graphs and related systems enabled the partners to combine ACR-derived viewing data with other datasets, including advertising identifiers and partner-provided information, to generate detailed, cross-device profiles reflecting Plaintiffs' viewing habits, preferences, and personal characteristics.

202. Through this aggregation and profiling, those third-party recipients were able to infer sensitive attributes about Plaintiffs and Class Members—including their political preferences, religious beliefs, health conditions, sexual orientation, family composition, financial status, and

personal interests—and to associate those attributes with identifiable households and devices, and to use these profiles to create audience segments, enable targeted advertising, and facilitate cross-device tracking, and to disclose or make the resulting information available to other ad-tech partners, advertisers, data brokers, and identity-resolution providers for commercial purposes.

203. This conduct—intercepting and analyzing Plaintiffs' private viewing activity in real time or near-real time, linking that activity to persistent identifiers, constructing cross-device identity profiles, and disseminating those profiles within the connected-television advertising ecosystem—constitutes a separate and independently actionable intrusion into Plaintiffs' and Class Members' private affairs.

204. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in § XII, *supra*.

205. Defendant's intrusion into Plaintiffs' private affairs would be highly offensive to a reasonable person.

206. A reasonable consumer would not expect that a television would continuously monitor and record the content displayed on its screen for the purpose of data collection and advertising.

207. Defendant's conduct therefore constitutes an intentional intrusion upon the solitude and seclusion of Plaintiffs and members of the Class.

208. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

209. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

**COUNT II**

**Invasion of Privacy – Public Disclosure of Private Facts**

**(On Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)**

210. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

211. At all relevant times, Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity and related information would remain private.

212. Defendant, through its Smart TVs and embedded ACR technology, collected and disclosed private, Sensitive Information concerning Plaintiffs' viewing behavior.

213. Specifically, Samsung collected detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

214. This information also included content viewed through third-party applications, broadcast signals, and external devices connected via HDMI.

215. The viewing information collected by Samsung constituted private facts because it reflected Plaintiffs' personal interests, habits, and preferences.

216. More specifically, the private facts Defendant disclosed are not merely that Plaintiffs watched unspecified content; rather, they include (i) specific program titles, episodes, advertisements, and external-input content viewed by each Plaintiff; (ii) timestamped logs of each viewing session, by household and device; and (iii) inferred sensitive attributes about each Plaintiff that Defendant's ad-tech partners, on information and belief including downstream advertising and identity-resolution partners, expressly compute from the disclosed viewing data, including political beliefs and affiliations (e.g., audience segments built from State of the Union viewing or "liberal affinity news" or "conservative affinity news" viewing), religious beliefs and observances, sexual orientation (e.g., audience segments built from Pride Month programming), racial and ethnic identification, family composition (including the presence and ages of children), health conditions

and medical concerns, financial circumstances, and other intimate personal characteristics. These categories of inferred personal attributes are precisely the "embarrassing" or "intimate" private facts that California courts and the Ninth Circuit have recognized as actionable. *See Harris v. iHeartMedia, Inc.*, 2026 WL 247875, at *1–2 (N.D. Cal. Jan. 29, 2026); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1088 (N.D. Cal. 2025); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 604 (9th Cir. 2020).

217. Defendant's disclosure of these private facts is "public" within the meaning of California law because it is not limited to a single recipient or a confidential audience. Defendant's disclosure pipeline routes the data to multiple separate corporate recipients—on information and belief including downstream advertising, measurement, and identity-resolution partners—and, through downstream commercial ad-tech pipelines, into the broader connected-television advertising ecosystem comprising numerous demand-side and supply-side platforms, identity-resolution providers, data brokers, advertisers, agencies, and measurement and attribution providers. Defendant's conduct therefore disseminates Plaintiffs' private facts well beyond a confidential or limited audience, satisfying the "public disclosure" element under California law.

218. Such viewing activity is inherently private and is not ordinarily exposed to the public.

219. Samsung disclosed this private, Sensitive Information to third parties, including advertisers, analytics providers, and other commercial entities.

220. Defendant's third-party ad-tech partners (on information and belief, downstream ad-tech recipients) received Plaintiffs' and Class Members' viewing data and associated identifiers in real time or near-real time and used that information to identify the specific audiovisual content viewed by Plaintiffs and Class Members, including programs, advertisements, and other on-screen material. In connection with this conduct, those partners associated Plaintiffs' viewing activity with persistent identifiers, including IP addresses, MAC addresses, advertising identifiers, household identifiers, and other signals, and combined that information with data obtained from third-party partners and data providers.

221. Through these processes, those third-party recipients constructed and maintained cross-device and household-level identity profiles that linked Plaintiffs' Samsung Smart TV viewing activity to other devices, identities, and datasets, and used these profiles to generate audience segments and other commercially valuable datasets reflecting Plaintiffs' viewing habits, interests, and inferred characteristics.

222. Those third-party recipients further disclosed or otherwise made available Plaintiffs' viewing information and derived profiles to additional third parties within the advertising and data ecosystem, including by re-distributing audience segments and targeting data to advertisers, agencies, and demand-side platforms. By transforming Plaintiffs' private viewing activity into identifiable, cross-device profiles and distributing that information to numerous third parties, Defendant caused Plaintiffs' private facts to be publicly disclosed within the meaning of California law.

223. Upon information and belief, Samsung shared or made available Plaintiffs' viewing data to these third parties in a manner that enabled them to use the data for targeted advertising, analytics, and profiling purposes.

224. Defendant's disclosures were not limited to a small or confidential group but instead were made to multiple third-party entities within the advertising and data ecosystem.

225. Through these disclosures, Plaintiffs' private viewing information was disseminated beyond Samsung and into a broader commercial network.

226. Defendant's disclosures were made without Plaintiffs' consent.

227. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

228. Samsung also failed to adequately disclose the scope and nature of the information being disclosed.

229. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

230. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

231. The private facts disclosed by Samsung would be highly offensive and objectionable to a reasonable person.

232. A reasonable consumer would not expect that a television manufacturer would collect and disclose detailed information about their viewing habits to third parties.

233. The disclosure of such information exposes intimate details about an individual's interests, beliefs, and lifestyle.

234. Defendant's conduct therefore constitutes a public disclosure of private facts.

235. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

236. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including compensatory damages, injunctive relief, and any other relief deemed appropriate by the Court.

## COUNT III

**Invasion of Privacy – Violation of the California Constitution (Art. I, § 1)**

**(On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg, and the California Subclasses; and, as to the public injunction, on behalf of the California general public)**

237. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

238. Plaintiffs bring this claim under Article I, Section 1 of the California Constitution, which guarantees a right to privacy.

239. The California Constitution protects individuals against the invasion of their privacy by private entities, including the unauthorized collection, use, and disclosure of personal information.

240. To establish a violation of the constitutional right to privacy, a plaintiff must show: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) a serious invasion of privacy.

241. Plaintiffs and members of the Class possessed legally protected privacy interests in their personal information, including their television viewing activity and related audiovisual data.

242. Plaintiffs' viewing behavior, including the content watched, the timing and duration of viewing sessions, and the sources of such content, constituted personal Sensitive Information.

243. This information revealed details about Plaintiffs' interests, habits, preferences, and personal characteristics.

244. Plaintiffs and members of the Class had a reasonable expectation that their television viewing activity within their homes would remain private.

245. The home is among the most private of spaces, and activities occurring within the home—including television viewing—are traditionally understood to be private.

246. Defendant violated Plaintiffs' reasonable expectation of privacy by collecting, analyzing, and disclosing Plaintiffs' viewing data through its Smart TVs and embedded ACR technology.

247. This capture occurred continuously during use of the television and operated independently of the source of the content.

248. Defendant's surveillance extended to content viewed through streaming applications, broadcast television, and external devices connected via HDMI.

249. Samsung thereby monitored Plaintiffs' viewing activity across all inputs and sources.

250. Samsung used the information obtained through this surveillance to build detailed profiles of Plaintiffs' viewing habits and preferences.

251. Samsung further disclosed or made this information available to third parties, including advertisers and analytics providers, for commercial purposes.

252. Defendant's conduct constituted a serious invasion of Plaintiffs' privacy.

253. The scope, duration, and nature of Defendant's surveillance—continuous monitoring of audiovisual content within the home—were highly intrusive.

254. Defendant's conduct enabled the collection of detailed and Sensitive Information about Plaintiffs' private life.

255. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

256. Samsung also failed to disclose the full scope and purpose of its data collection and sharing practices.

257. Even where settings existed to limit data collection or sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

258. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

259. Moreover, Defendant's surveillance affected individuals who never interacted with Defendant's disclosures or consent mechanisms, including other household members and guests.

260. Defendant's conduct therefore violated Plaintiffs' right to privacy under the California Constitution.

261. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and related damages.

262. Plaintiffs and members of the Class are entitled to all available legal and equitable remedies, including injunctive relief and any other relief deemed appropriate by the Court.

263. Plaintiffs, on behalf of the general public, seek public injunctive relief under the California Constitution enjoining Samsung from deploying, operating, or enabling Automatic Content Recognition technology that intercepts, records, or discloses the viewing activity or other personal information of California consumers without first obtaining clear, conspicuous, and separately disclosed consent. The primary purpose and effect of this relief is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Samsung Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. Because Samsung continues to manufacture, sell, and operate Smart TVs that perform this surveillance, its unlawful conduct is ongoing and, absent an injunction, will continue to harm the public at large. This relief is prospective, runs to the general public, and does not require the Court to consider the individual claims of any non-party. Plaintiffs and the general public have no adequate remedy at law to secure Defendant's future compliance with California law.

## COUNT IV

### Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 631

### (On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg, and the California Subclasses)

264. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

265. CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learn[s] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any

person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

266. Defendant is a person under CIPA § 631.

267. At all relevant times, Plaintiffs and members of the Class used Samsung Smart TVs to access and display audiovisual content transmitted over the internet and other communication networks while in California.

268. Defendant—directed from and within California—through its Smart TVs and embedded ACR technology, enabled, facilitated, and caused third parties—on information and belief including identity-resolution and data partners such as Experian and LiveRamp, advertisers receiving household-level exposure data through the Samsung DSP, and measurement partners such as Nielsen—to intercept Plaintiffs' communications while they were in transit.

269. Specifically, Samsung integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or visual information from content displayed on the television screen in near real time.

270. These third-party technologies intercepted communications transmitted to and from Plaintiffs' device, including content delivered through streaming services, broadcast signals, and external devices connected via HDMI.

271. This interception occurred contemporaneously with the transmission and display of audiovisual content, while such communications were in transit, and before they reached a completed and static form.

272. More specifically, Defendant's ACR architecture is designed to read and learn the contents of consumers' audiovisual communications while those communications are still in transit, before they are received in a completed and static form. Defendant's ACR software (developed and operated on information and belief through Defendant's relationships with third-party advertising and identity-resolution participants) generates content-identifying digital "fingerprints" on the Samsung Smart TV itself by sampling each frame of audio and video as the frame is rendered to the consumer's screen—as documented by independent academic forensics, in increments

measured in milliseconds (e.g., every 10 milliseconds, batched and transmitted to ACR-vendor servers every approximately 15 seconds). The fingerprint generation is itself a real-time learning of the substance, purport, and meaning of the audiovisual communication: the device-side ACR module identifies the on-screen content (program, episode, advertisement, application, or HDMI source) at the moment of display and prior to any persistent storage of the fingerprint by the ACR vendor.

273. Once transmitted, the fingerprints are matched in real time or near-real time against Defendant-controlled databases of known content. That matching process is itself a contemporaneous learning of the contents of Plaintiffs' communications: the ACR vendor identifies the specific program, episode, advertisement, or external-input content displayed on the Samsung Smart TV before the data is stored, before the consumer's viewing session is complete, and before the audiovisual communication has reached a completed and static form on the consumer's screen. Plaintiffs further allege, on information and belief, that third parties incorporates the identified content into household-level audience segments, identity-graph nodes, and real-time bidding inventories before the consumer finishes watching the content—and that downstream identity-resolution partners likewise incorporate the identifier-, account-, and application-telemetry data it receives from Samsung Smart TVs into household-level audience segments, identity-graph nodes, and real-time bidding inventories on the same contemporaneous basis.

274. Accordingly, Defendant's and the third-party ACR vendors' interception of Plaintiffs' communications is not a mere post-hoc processing of stored data. It is a real-time, frame-by-frame reading and learning of the contents of consumers' audiovisual communications while those communications are in transit and before they reach a completed and static form, in violation of Cal. Penal Code § 631(a).

275. By capturing the audiovisual content displayed on Plaintiffs' screens and processing it through digital fingerprinting and content-matching to identify and learn the specific content viewed and its meaning, Defendant read, acquired, and learned the contents of Plaintiffs' electronic communications.

276. Samsung is also liable under the aiding prong of § 631(a). Samsung knowingly and willfully aided, agreed with, employed, and conspired with third parties to intercept, read, attempt to read, and learn the contents and meaning of Plaintiffs' and Class Members' electronic communications. On information and belief, those third parties include the Samsung-affiliated entities that operate the ACR back-end and Samsung Ads systems (each a corporate person separate from Defendant), the identity-resolution and data partners whose systems receive and match the intercepted contents and associated identifiers (on information and belief including Experian and LiveRamp), and the demand-side platforms and measurement providers that receive household-level exposure data. Samsung's aid was concrete, knowing, and indispensable: Samsung designed and installed the ACR client on each Samsung Smart TV; configured the servers and endpoints to which content fingerprints and identifiers are transmitted; contracted with those third parties and provided them device- and household-level identifiers; and was compensated for doing so through its Samsung Ads advertising business.

277. Samsung's own interception is complete in transit regardless of any third party's timing: by the time any third party receives, reads, or matches the contents of Plaintiffs' communications, Samsung's ACR system has already captured, read, and learned those contents while in transit, in violation of § 631(a), and Samsung's subsequent use and disclosure of those contents violate the statute independently. In addition, Plaintiffs allege on information and belief—subject to further forensic and expert analysis of the ACR transmission architecture—that transmission of content fingerprints and associated identifiers to servers operated by or for Samsung's affiliates and partners occurs contemporaneously with, or within moments of, the underlying communications, such that those third parties read and learn the contents of Plaintiffs' communications in real time or near-real time.

278. Each such third party is a separate "person" within the meaning of Cal. Penal Code § 631(a) and the cases construing it. Defendant's status as a party to certain of those communications therefore does not shield it from liability, because Defendant's conduct falls within the "aids, agrees with, employs, or conspires with any person or persons" clause of § 631(a).

279. Defendant's aiding was undertaken knowingly and intentionally, with full awareness that the third parties would, in real time or near-real time, capture, decode, fingerprint, and learn the contents and meaning of consumers' private viewing communications. Samsung engineered and configured its Smart TVs, software, and over-the-air updates with the specific purpose of enabling these third-party interceptions; entered into commercial agreements the express purpose of which is to enable third-party access to consumers' intercepted ACR communications; and continues to update and operationally support the systems through which the third-party interceptions occur.

280. Samsung provided the hardware, software environment, and system-level access necessary for these third parties to perform the interception.

281. Samsung also configured its Smart TVs to permit and facilitate the operation of these third-party interception technologies across all inputs, including:

- content streamed through third-party applications;
- cable and broadcast television signals; and
- content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

282. As a result, third parties intercepted communications that occurred entirely outside of Defendant's own services or platforms.

283. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

284. Because CIPA requires the consent of all parties to a communication, the real-time and near-real-time interception of communications by Defendant's third-party partners—on information and belief including identity-resolution and data partners such as Experian and LiveRamp, advertisers receiving household-level exposure data through the Samsung DSP, and measurement partners such as Nielsen, and additional downstream demand-side platforms, supply-

side platforms, identity-resolution providers, and measurement and attribution providers—was unlawful.

285. Each downstream third-party recipient of the intercepted communications is a corporate person separate and distinct from Defendant. Defendant's transmission of the contents of Plaintiffs' communications to those recipients was therefore a disclosure to third parties, not an internal transfer within a single entity.

286. Plaintiffs and members of the Class had a reasonable expectation that their viewing activity—including the audiovisual content displayed on their televisions—would not be intercepted or monitored by Samsung.

287. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

288. As a direct and proximate result of Defendant's violations of CIPA, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

289. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT V

### Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 632

### (On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg, and the California Subclasses)

290. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

291. Cal. Penal Code § 632 prohibits any person, without the consent of all parties to a confidential communication, from intentionally eavesdropping upon or recording the confidential communication by means of any electronic amplifying or recording device.

292. At all relevant times, Plaintiffs and members of the Class engaged in communications through their use of Samsung Smart TVs, including audiovisual transmissions delivered through streaming applications, broadcast signals, and external devices connected via HDMI.

293. Defendant, through its Smart TVs and embedded ACR technology, installed or used—and enabled, facilitated, and caused third parties, on information and belief including identity-resolution and data partners such as Experian and LiveRamp, advertisers receiving household-level exposure data through the Samsung DSP, and measurement partners such as Nielsen, to install or use—a process that recorded and captured the routing, addressing, and signaling information associated with Plaintiffs' electronic communications, including IP addresses, device and household identifiers, and the origin, destination, timing, and fact of the transmissions of Plaintiffs' viewing data.

294. Specifically, Samsung integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured audio and/or audiovisual information from content displayed on the television screen in near real time.

295. Samsung provided third parties with persistent identifiers, device-level access, and content recognition outputs sufficient to associate recorded communications with specific users and households.

296. Plaintiffs and members of the Class reasonably expected that their viewing activity and the audio and audiovisual content displayed within their homes would not be recorded or monitored by Samsung.

297. The communications occurred within private residences and concerned personal viewing choices, habits, and interests, which are inherently private in nature.

298. Samsung configured its Smart TVs to permit and facilitate the operation of these third-party recording technologies across all inputs, including:

a. content streamed through third-party applications;

b. cable and broadcast television signals; and

c. content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI, as well as other personal devices connected over Wi-Fi internet, such as computers, smartphones and tablets.

299. Plaintiffs and members of the Class did not consent to the recording of their confidential communications by Defendant's third-party partners.

300. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

301. Because CIPA requires the consent of all parties to a communication, the recording of communications by Defendant's third-party partners—on information and belief including downstream advertising, measurement, and identity-resolution partners—was unlawful.

302. Plaintiffs and members of the Class had a reasonable expectation that their confidential communications—including audiovisual content viewed within their homes—would not be recorded by Samsung.

303. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

304. As a direct and proximate result of Defendant's violations of Cal. Penal Code § 632, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

305. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

**COUNT VI**

**Violation of the California Invasion of Privacy Act (CIPA), Cal. Penal Code §§ 638.50–638.51**

**(On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg, and the California Subclasses)**

306. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

307. Cal. Penal Code § 638.50 prohibits any person or entity from knowingly installing or using a pen register or trap and trace device without first obtaining a court order or authorization as required by law.

308. Cal. Penal Code § 638.51 prohibits any person or entity from installing or using a pen register or trap and trace device without the consent of the user of the service.

309. A "pen register" is defined under California law as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.

310. A "trap and trace device" is defined as a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication.

311. At all relevant times, Plaintiffs and members of the Class used Samsung Smart TVs to send and receive electronic communications over the internet and other communication networks while in California.

312. These communications included, among other things:

a. requests for streaming video content;

b. application usage data;

c. device-level communications between Smart TVs and remote servers; and

d. audiovisual transmissions delivered to the television through streaming services and external devices.

313. Defendant, through its Smart TVs and embedded ACR technology, knowingly installed and operated processes that functioned as pen registers and trap and trace devices.

314. Specifically, Defendant's ACR system and related telemetry processes captured and recorded routing, addressing, and signaling information associated with communications transmitted to and from Plaintiffs' Smart TV.

315. This information included, among other things:

a. identifiers associated with content being requested or displayed;

b. application identifiers and usage signals;

c. device identifiers and network information; and

d. other metadata reflecting how, when, and from where communications were transmitted.

316. Defendant's systems captured this information contemporaneously with the transmission of communications and without regard to the source of the content.

317. By capturing and processing this information, Samsung recorded dialing, routing, addressing, and signaling information associated with Plaintiffs' electronic communications.

318. Samsung also captured incoming and outgoing communication signals sufficient to identify the source and destination of communications involving Plaintiffs' Smart TV.

319. Defendant's conduct therefore constituted the use of pen registers and trap and trace devices within the meaning of Cal. Penal Code §§ 638.50–638.51.

320. Samsung installed and used these devices and processes without obtaining a court order or lawful authorization.

321. Samsung also installed and used these devices and processes without the consent of Plaintiffs and members of the Class.

322. Plaintiffs and members of the Class were not informed that Samsung would capture routing, addressing, and signaling information associated with their communications.

323. Any purported consent obtained by Samsung was invalid because it was not informed, explicit, or meaningful.

324. Samsung obscured the nature of its data collection through misleading terminology, including labeling its surveillance features as "Viewing Information Services."

325. Specifically, Samsung integrated and deployed third-party ACR and analytics technologies within its Smart TVs that captured communications and associated signaling information, and Samsung aided and assisted those third parties to capture that information.

326. Samsung knowingly aided, agreed with, employed, and conspired with these third parties to install and use such pen-register and trap-and-trace processes on Plaintiffs' Samsung Smart TVs, without Plaintiffs' consent and without a court order, in violation of Cal. Penal Code §§ 638.50–638.51.

327. Moreover, Defendant's data collection captured communications and associated signaling information of individuals who never interacted with Defendant's disclosures or consent mechanisms, including other household members and guests.

328. Plaintiffs and members of the Class had a reasonable expectation that the routing, addressing, and signaling information associated with their communications would not be captured or monitored by Samsung.

329. Defendant's conduct constitutes an egregious invasion of privacy and a violation of California law.

330. As a direct and proximate result of Defendant's violations of Cal. Penal Code §§ 638.50–638.51, Plaintiffs and members of the Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

331. Pursuant to Cal. Penal Code § 637.2 and other applicable provisions, Plaintiffs and members of the Class seek statutory damages, injunctive relief, and all other relief available under the law.

## COUNT VII

**Violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502**

**(On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg, and the California Subclasses)**

332. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

333. Plaintiffs bring this claim under the CDAFA, Cal. Penal Code § 502.

334. At all relevant times, Plaintiffs' Samsung Smart TVs constituted a "computer," "computer system," and/or "computer network" within the meaning of Cal. Penal Code § 502(b).

335. Plaintiffs and members of the Class were the owners and/or authorized users of their Samsung Smart TVs.

336. Defendant knowingly and without permission accessed, used, and caused to be used Plaintiffs' Smart TV and related computer systems.

337. Specifically, Samsung, through its embedded ACR technology and related software processes, accessed Plaintiffs' Smart TV to collect, extract, and transmit data regarding Plaintiffs' viewing activity.

338. Defendant's conduct included taking, copying, and making use of data from Plaintiffs' Smart TV, including audiovisual content information, device-level data, and associated identifiers.

339. Samsung used this data for its own commercial purposes, including advertising, analytics, and consumer profiling.

340. Defendant's conduct violated Cal. Penal Code § 502(c), including but not limited to:

a. § 502(c)(1), by knowingly accessing and without permission altering, damaging, deleting, destroying, or otherwise using data and computer systems;

b. § 502(c)(2), by knowingly accessing and without permission taking, copying, or making use of data from a computer, computer system, or computer network;

c. § 502(c)(3), by knowingly and without permission using or causing to be used computer services; and

d. § 502(c)(7), by knowingly accessing or causing to be accessed any computer, computer system, or computer network without permission.

341. Defendant's access to Plaintiffs' Smart TVs and associated data was without permission because Plaintiffs did not authorize Samsung to collect, extract, or monetize detailed information about the audiovisual content displayed on the device.

342. Any purported authorization obtained by Samsung was invalid because it was not informed, explicit, or meaningful.

343. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

344. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class suffered damage and loss within the meaning of Cal. Penal Code § 502(e), including but not limited to:

a. unauthorized use of their devices and data;

b. misappropriation of valuable personal information; and

c. loss of control over their data.

345. Defendant's conduct was knowing, intentional, and wrongful.

346. *Pleading expressly in the alternative to Plaintiffs' invasion of privacy claims*, Plaintiffs and Class Members have suffered "damage or loss" within the meaning of Cal. Penal Code § 502(e). Plaintiffs intended to retain the option to monetize, license, or otherwise control the disposition of their viewing data and household-level identifiers, including by participating in the established market in which companies (such as Nielsen, UpVoice, HoneyGain, SavvyConnect, and others) compensate consumers in exchange for license to track specified categories of personal data. Defendant's unauthorized capture, extraction, transmission, and re-distribution of Plaintiffs' viewing data and identifiers materially diminished the value of that data to Plaintiffs by (i) extracting and segmenting the data before Plaintiffs could license it themselves, (ii) injecting the data into proprietary identity graphs and audience segments operated by other downstream recipients (which exclude Plaintiffs from any subsequent monetization), and (iii) reducing the

marginal commercial value of the data on the consumer-data market by virtue of its prior unauthorized commercial exploitation. Plaintiffs have therefore suffered both deprivation of the right to control their data and a diminution in its market value—each of which constitutes "damage or loss" under § 502(e).

347. In addition, Plaintiffs and Class Members have incurred (and on information and belief will continue to incur) reasonable expenditures—within the meaning of Cal. Penal Code § 502(e)(1)—to investigate, identify, and verify the unauthorized access to and extraction of data from their Samsung Smart TVs, including time and resources expended to ascertain whether their Smart TV systems and stored configuration data have been altered, accessed, or used by Defendant and the third-party ACR vendors (on information and belief, downstream ad-tech recipients) without authorization.

348. Pursuant to Cal. Penal Code § 502(e) and (e)(1), Plaintiffs and members of the Class seek compensatory damages, injunctive relief, and all other relief available under the law.

## COUNT VIII

**Violation of the Federal Wiretap Act (as amended by the Electronic Communications Privacy Act or "ECPA"), 18 U.S.C. § 2510, *et seq*.**

**(On Behalf of Plaintiffs and the Nationwide Classes)**

349. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

350. Plaintiffs bring this claim under the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*.

351. The Federal Wiretap Act prohibits any person from intentionally intercepting, or endeavoring to intercept, the contents of any electronic communication, and from intentionally using or disclosing the contents of any electronic communication knowing or having reason to know that the information was obtained through an unlawful interception.

352. At all relevant times, Plaintiffs and members of the Nationwide Class transmitted and received electronic communications through their use of Samsung Smart TVs.

353. These communications included, among other things, streaming video content, audiovisual transmissions, application data, and communications between Plaintiffs' Smart TV and remote servers.

354. These transmissions constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

355. Defendant, through its Smart TVs and embedded ACR technology, itself intentionally intercepted and endeavored to intercept these communications.

356. Specifically, Defendant's ACR system captured audio and/or visual information from content displayed on Plaintiffs' television screen in near real time.

357. This capture occurred contemporaneously with the transmission and display of the communications.

358. By capturing the audiovisual content displayed on Plaintiffs' screens and processing it through digital fingerprinting and content-matching to identify and learn the specific content viewed and its meaning, Defendant read, acquired, and learned the contents of Plaintiffs' electronic communications.

359. Defendant's interception occurred while the communications were in transit, and before they reached their intended destination in a completed and static form.

360. Defendant's ACR system captured communications across all inputs, including:

a. content streamed through third-party applications;

b. cable and broadcast television signals; and

c. content from external devices such as streaming boxes, gaming consoles, and computers connected via HDMI.

361. As a result, Samsung intercepted communications that occurred entirely outside of Defendant's own services or platforms.

362. Samsung also used and disclosed the contents of these communications for its own commercial purposes, including advertising, analytics, and profiling.

363. Defendant's conduct was intentional.

364. Plaintiffs and members of the Nationwide Class did not consent to Defendant's interception, use, or disclosure of their communications.

365. Any purported consent obtained by Samsung was invalid because it was not informed, explicit, or meaningful.

366. Even if Defendant were deemed a party to any of the intercepted communications, the party exception set forth in 18 U.S.C. § 2511(2)(d) does not apply, because Defendant intercepted those communications for the purpose of committing the tortious acts described below.

367. Defendant intercepted Plaintiffs' communications in order to collect, analyze, profile, disclose, and monetize detailed information regarding Plaintiffs' private viewing activity, without authorization.

368. Defendant intercepted Plaintiffs' communications for the purpose of committing an independent tort: invasion of privacy by intrusion upon seclusion, *as alleged in Count I*. That tortious purpose is separate and independent from the act of interception itself, because the intrusion is accomplished not by the mere capture of the communications, but by Defendant's subsequent compilation of Plaintiffs' viewing activity into persistent, cross-device household profiles tied to identifying information, and by Defendant's disclosure and sale of that information to the broader connected-television advertising ecosystem.

369. Defendant additionally intercepted Plaintiffs' communications for the purpose of committing the independent tort of public disclosure of private facts, *as alleged in Count II*, which Defendant accomplished by disclosing the contents of the intercepted communications and associated identifiers into real-time-bidding auctions and to numerous separate recipients across the connected-television advertising and data-broker ecosystem.

370. That Defendant's interception was also motivated by commercial gain does not place its conduct outside 18 U.S.C. § 2511(2)(d). Defendant accomplishes its monetization of Plaintiffs' viewing activity through the very privacy invasions described above; the purpose of the interception, and its intended use, was to compile, disclose, and exploit Plaintiffs' private viewing activity, and Defendant's resulting profit does not negate that tortious purpose.

371. Defendant's interception of Plaintiffs' communications was therefore carried out for a tortious purpose within the meaning of 18 U.S.C. § 2511(2)(d), and the party exception does not shield Defendant from liability.

372. Defendant also used and disclosed the contents of Plaintiffs' intercepted communications, together with associated identifiers, in real time and near-real time to multiple separate recipients—on information and belief including identity-resolution and data partners such as Experian and LiveRamp, advertisers receiving household-level exposure data through the Samsung DSP, and measurement partners such as Nielsen, and downstream demand-side platforms, supply-side platforms, identity-resolution providers, data brokers, and measurement and attribution providers, and into real-time-bidding auctions—in violation of 18 U.S.C. § 2511(1)(c) and (d), knowing and having reason to know that those contents had been obtained through the interception described above. This widespread disclosure further confirms that Defendant's purpose in intercepting Plaintiffs' communications was to commit the privacy torts described above.

373. Accordingly, any purported consent—whether actual, implied, or constructive—does not shield Samsung from liability under the Federal Wiretap Act.

374. Defendant's disclosures further obscured the nature of its surveillance through misleading terminology, including labeling its ACR features as "Viewing Information Services."

375. Samsung presented disclosures during a forced, multi-step setup process that conditioned use of the television on clicking through all terms, without affording consumers a meaningful opportunity to review, understand, or decline them, and failed to clearly inform users that Samsung would intercept, record, analyze, and monetize the content of their communications.

376. Defendant's conduct therefore was not authorized by law and does not fall within any statutory exception.

377. As a direct and proximate result of Defendant's violations of the Federal Wiretap Act, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy, loss of control over personal information, and statutory damages.

378. Pursuant to 18 U.S.C. § 2520, Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, injunctive relief, and all other relief available under the law.

**COUNT IX**

**Violation of the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710**

**(On Behalf of Plaintiffs and the Nationwide Classes)**

379. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

380. Plaintiffs bring this claim under the VPPA, 18 U.S.C. § 2710.

381. The VPPA prohibits a "video tape service provider" from knowingly disclosing to any person personally identifiable information concerning a consumer's request for or obtaining of specific video materials or services, without the informed, written consent of the consumer.

382. Defendant was, and is, a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4), because it engaged in the business of delivering, providing, and facilitating access to audiovisual content and video programming through its Smart TVs and integrated software platforms.

383. More specifically, Samsung is "engaged in the business of … rental, sale, or delivery of … similar audio visual materials" under 18 U.S.C. § 2710(a)(4) because, inter alia: (i) Samsung markets, distributes, and operates streaming-video services that are pre-installed and prominently featured on Samsung Smart TVs, including curated catalogs of video content delivered to consumers directly by Samsung; (ii) Defendant's Smart TV home screens and content-discovery rails curate and surface specific audiovisual content from Samsung-controlled video sources to the consumer; and (iii) Samsung makes available to consumers an integrated platform through which audiovisual content is delivered. Defendant's video-content-delivery business constitutes a substantial focus of Defendant's work.

384. Plaintiffs are "consumers" under 18 U.S.C. § 2710(a)(1) because each Plaintiff is, at minimum, a "subscriber" of Defendant's video goods or services. Each Plaintiff connected their Samsung Smart TV with Samsung on initial device setup; each Plaintiff provided personal

information to Samsung in connection with that connection; and each Plaintiff has accessed audiovisual content delivered through Defendant's integrated streaming services. These commitments and exchanges of value satisfy the "subscriber" definition.

385. The information Samsung has knowingly disclosed constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) and the "ordinary person" test. Specifically, Samsung has disclosed to third-party identity-resolution, data, and measurement partners—on information and belief including Experian—and other downstream third-party recipients—in real time and near-real time, in transmissions transmitted from each Plaintiff's Samsung Smart TV—the specific audiovisual content viewed by Plaintiffs (including specific program titles, episodes, advertisements, and external-input identifications) tied directly and inextricably to persistent identifiers (including IP address, MAC address, advertising identifier, household identifier, and Samsung account identifier). The combination of specific viewing-content identification + persistent personal identifiers "readily permits an ordinary person to identify a particular individual as having watched certain videos"—indeed, that combination is precisely the basis on which other downstream recipients construct identity-graph profiles, target consumers across devices, and measure advertising attribution at the household and individual level.

386. The data Samsung discloses is personally identifiable in the concrete sense that matters. Samsung's disclosures do not consist of bare technical identifiers in isolation: the commercial *purpose* and *design* of Samsung's disclosure architecture—including the integration of Experian's identity data, built on hundreds of millions of hashed email addresses matched to households—is to link viewing data to identified or readily identifiable individuals and households. The recipients of the data are sophisticated identity-resolution, data, and measurement companies for whom the identifiers accompanying each viewing record readily identify a specific person or household, and an ordinary person in the recipients' position could and would use that information to identify the individuals whose viewing is disclosed.

387. Each Plaintiff was a "consumer" within the meaning of 18 U.S.C. § 2710(a)(1), as Plaintiffs used Defendant's Smart TV services to obtain video content.

388. Defendant knowingly disclosed to third parties personally identifiable information ("PII") concerning Plaintiffs' requests for and viewing of specific video materials and services.

389. Specifically, Samsung collected and disclosed detailed information about the audiovisual content displayed on Plaintiffs' television, including the programs watched, the timing and duration of viewing sessions, and the sources of such content.

390. This information included content viewed through streaming applications, broadcast signals, and external devices connected via HDMI.

391. Samsung disclosed this viewing information to third parties, including advertisers, analytics providers, and other commercial entities.

392. Upon information and belief, Samsung disclosed Plaintiffs' viewing data in conjunction with persistent identifiers and other information that allowed third parties to identify Plaintiffs and/or Plaintiffs' households.

393. These identifiers included, among other things, device identifiers, network identifiers, and other unique identifiers associated with Plaintiffs' Smart TV.

394. By linking viewing information with such identifiers, Samsung disclosed information that identified Plaintiffs as having requested or obtained specific video materials or services.

395. The information disclosed by Samsung therefore constituted "personally identifiable information" within the meaning of the VPPA.

396. Samsung made these disclosures knowingly.

397. Plaintiffs did not provide informed, written consent to Defendant's disclosure of Plaintiffs' personally identifiable viewing information.

398. Plaintiffs and members of the Nationwide Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

399. Samsung also failed to disclose the scope, nature, and purpose of such disclosures.

400. Even where settings existed to limit data sharing, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

401. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

402. Defendant's conduct constituted a violation of 18 U.S.C. § 2710(b)(1).

403. As a direct and proximate result of Defendant's violations of the VPPA, Plaintiffs and members of the Nationwide Class have suffered harm, including invasion of privacy and loss of control over personal information.

404. Pursuant to 18 U.S.C. § 2710(c), Plaintiffs and members of the Nationwide Class seek statutory damages, punitive damages, attorneys' fees and costs, injunctive relief, and all other relief available under the law.

## COUNT X

### Negligence

### (On Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

405. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

406. At all relevant times, Defendant owed Plaintiffs and members of the Class a duty to exercise reasonable care in the design, development, manufacture, configuration, and operation of its Smart TVs and embedded software systems.

407. Defendant's duty of reasonable care extends to refraining from the unauthorized interception, use, and disclosure of Plaintiffs' and Class Members' viewing communications and identifiers, and to making accurate and adequate disclosures of its data-collection practices, given Defendant's exclusive knowledge of those practices and the foreseeable harm to consumers from their concealment.

408. Defendant's breaches of duty include the active design and operation of an architectural surveillance and disclosure pipeline that intentionally collects, transmits, and re-

distributes Plaintiffs' sensitive viewing data and identifiers, in violation of Plaintiffs' reasonable expectations and applicable law. Negligent design and negligent configuration of consumer-electronic devices—as distinct from negligent failure to safeguard data already lawfully collected—are independently actionable.

409. Samsung also owed a duty to refrain from collecting, accessing, using, and disclosing Plaintiffs' personal information without authorization or adequate disclosure.

410. Samsung further owed a duty to implement reasonable practices to protect consumers' privacy and to avoid engaging in conduct that foreseeably invaded users' privacy interests.

411. Samsung knew or should have known that its Smart TVs would be used within consumers' homes and would display sensitive audiovisual content reflecting users' personal interests, habits, and preferences.

412. Samsung knew or should have known that the continuous monitoring and capture of such content through ACR technology would intrude upon users' privacy and expose personal Sensitive Information.

413. Samsung breached its duties by, among other things:

a. designing and deploying ACR technology that continuously monitored and captured audiovisual content displayed on users' televisions;

b. collecting detailed information about Plaintiffs' viewing activity without adequate disclosure or authorization;

c. accessing and extracting data from Plaintiffs' Smart TV for purposes unrelated to core device functionality;

d. failing to implement reasonable and transparent consent mechanisms;

e. obscuring its data collection practices through misleading terminology and design; and

f. disclosing or making available Plaintiffs' viewing information to third parties for commercial purposes.

414. Defendant's conduct fell below the standard of care expected of a reasonable company operating connected consumer devices in the home.

415. Defendant's actions were negligent and created a foreseeable risk of harm to Plaintiffs and members of the Class.

416. Plaintiffs and members of the Class did not consent to Defendant's conduct.

417. Any purported consent obtained by Samsung was invalid because it was not informed, explicit, or meaningful.

418. Defendant's conduct was a substantial factor in causing harm to Plaintiffs and members of the Class.

419. As a direct and proximate result of Defendant's negligence, Plaintiffs and members of the Class have suffered damages, including invasion of privacy, loss of control over personal information, and the unauthorized use and exploitation of their data.

420. Plaintiffs and members of the Class are entitled to recover damages, injunctive relief, and all other relief available under California law.

## COUNT XI

**Violation of California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.***

**(On Behalf of Plaintiffs Tillery, Walsh and Rosenberg and the California Subclasses; and, as to the public injunction, on behalf of the California general public)**

421. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

422. To the extent Rule 9(b) of the Federal Rules of Civil Procedure applies to this claim, Plaintiffs incorporate the heightened-pleading allegations set forth in § XI, *supra*, which identify the party responsible for, the content of, the location and timing of, and the manner of Defendant's misrepresentations and omissions.

423. Plaintiffs bring this claim under California's UCL, Cal. Bus. & Prof. Code § 17200 *et seq*.

424. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice.

425. Defendant engaged in unlawful, unfair, and fraudulent business acts and practices in connection with its Smart TVs and embedded ACR technology.

**Unlawful Prong**

426. Defendant's conduct violated multiple laws, including but not limited to:

a. the California Invasion of Privacy Act (Cal. Penal Code §§ 631, 632, 638.50–638.51);

b. the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502); and

c. the Federal Wiretap Act (18 U.S.C. § 2510 *et seq*.).

427. These violations constitute "unlawful" business acts and practices under the UCL.

**Unfair Prong**

428. Defendant's conduct was unfair because it offended established public policy and was immoral, unethical, oppressive, and substantially injurious to consumers.

429. Defendant's conduct caused substantial injury to Plaintiffs and members of the Class by invading their privacy and misappropriating their personal information.

430. The harm to Plaintiffs and members of the Class outweighed any purported benefits associated with Defendant's conduct.

431. Plaintiffs and members of the Class could not reasonably have avoided the injury.

432. Defendant's surveillance practices were not necessary to provide the core functionality of its Smart TVs and instead served Defendant's commercial interests in data collection and advertising.

433. Samsung continuously monitored the content displayed on consumers' televisions, including content from streaming applications, broadcast signals, and HDMI-connected devices.

434. Samsung collected, analyzed, and monetized detailed information about Plaintiffs' viewing activity.

435. Samsung also shared or made this information available to third parties, including advertisers and analytics providers.

436. Defendant's conduct therefore constituted an unfair business practice.

**Fraudulent Prong**

437. Defendant's conduct was fraudulent because it was likely to deceive reasonable consumers.

438. Samsung misrepresented and omitted material facts regarding its data collection and surveillance practices.

439. Samsung used misleading terminology, including labeling its ACR features as "Viewing Information Services," which did not disclose that the feature enabled continuous monitoring of on-screen content.

440. Samsung failed to clearly disclose that it would capture, analyze, and monetize the audiovisual content displayed on consumers' televisions.

441. Samsung also failed to disclose that such information would be shared with or made available to third parties.

442. Samsung presented disclosures during a forced, multi-step setup process that conditioned use of the television on clicking through all terms, without affording consumers (or third parties who set up the TV) a meaningful opportunity to review, understand, or decline them.

443. Even where settings existed to limit data collection, those settings were difficult to locate, buried within multiple layers of menus, and not clearly described.

444. Defendant's consent framework therefore constitutes a "dark pattern" designed to obtain user acquiescence rather than informed consent.

445. These misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase or use a Samsung Smart TV.

446. Plaintiffs and members of the Class were likely to be deceived by Defendant's conduct.

447. As a result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiffs and members of the Class suffered injury in fact and lost money or property.

448. Plaintiffs and members of the Class lost the value of their personal information and the benefit of their bargain.

449. Plaintiffs and members of the Class would not have purchased, or would have paid less for, Samsung Smart TVs had they known of Defendant's conduct.

450. Plaintiffs and members of the Class have suffered injury in fact and lost money or property as a direct result of Defendant's unfair, unlawful, and fraudulent business practices. Plaintiffs paid for their Samsung Smart TVs (with the consumer purchase price flowing in substantial part to Defendant as wholesale revenue, even where the immediate point-of-sale transaction was through a retailer such as Best Buy, Costco, Target, or Walmart). Plaintiffs would not have purchased their Samsung Smart TVs at the prices paid—and, on information and belief, would have purchased a competing television, paid less, or not purchased a Smart TV at all—had Defendant disclosed (i) Defendant's continuous, frame-by-frame ACR surveillance and (ii) Defendant's real-time and near-real-time disclosure of consumers' viewing communications and identifiers to multiple separate third parties, on information and belief including downstream advertising and identity-resolution partners.

451. Defendant's misrepresentations and material omissions are precisely the kind that satisfy the UCL "fraudulent" prong: Defendant's marketing materials, packaging, and on-device disclosures portray the Samsung Smart TV as a premium personal entertainment device that delivers personalized content recommendations and a tailored viewing experience, while affirmatively concealing (a) the existence and operation of continuous frame-by-frame ACR surveillance behind the misleading "Viewing Information Services" labels, (b) the real-time disclosure of viewing data to other downstream recipients, and (c) the transfer of, and facilitation of access to, bulk consumer data by Defendant's affiliates. These misrepresentations and omissions were material to Plaintiffs' purchasing decisions, and Plaintiffs reasonably relied on Defendant's representations and the absence of disclosure of these practices.

452. Plaintiffs' personal information and ACR-derived viewing data also have independent economic value in identifiable markets. Industry data confirms that consumer behavioral and viewing data has substantial and increasing per-user value—reflected in the existence of an established market in which companies (including Nielsen, UpVoice, HoneyGain, SavvyConnect, Google, and others) compensate consumers in exchange for license to track and use specified categories of behavioral data. Plaintiffs have been deprived of the ability to license, monetize, or otherwise control their viewing data through that market because Defendant's interception of Plaintiffs' viewing data and the re-distribution of that data through the broader CTV advertising ecosystem have already extracted, segmented, and monetized that data without Plaintiffs' consent. *See Brown v. Google LLC*, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021).

453. Plaintiffs lack an adequate remedy at law for the equitable relief they seek under the UCL. The injunctive and restitutionary relief Plaintiffs seek—including orders compelling Defendant to cease ongoing ACR collection, to delete or de-identify previously collected data, and to implement clear and conspicuous disclosures and meaningful opt-out controls—addresses future harm that is not available through any of Plaintiffs' legal claims, which are limited to backward-looking compensatory and statutory damages. Plaintiffs therefore satisfy *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

454. Even if any of the foregoing economic-injury allegations were deemed insufficient, Plaintiffs alternatively seek disgorgement of Defendant's ill-gotten gains under the UCL on the basis that Defendant is not entitled to retain profits that they realized from the misappropriation of Plaintiffs' personal information and audiovisual communications, irrespective of any corresponding economic loss to Plaintiffs.

455. Plaintiffs seek restitution, injunctive relief, and all other relief available under Cal. Bus. & Prof. Code § 17203.

456. Plaintiffs, on behalf of the general public, seek public injunctive relief under the UCL, Cal. Bus. & Prof. Code § 17203, enjoining Samsung from deploying, operating, or enabling Automatic Content Recognition technology that intercepts, records, or discloses the viewing

activity or other personal information of California consumers without first obtaining clear, conspicuous, and separately disclosed consent. The primary purpose and effect of this relief is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Samsung Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. Because Samsung continues to manufacture, sell, and operate Smart TVs that perform this surveillance, its unlawful conduct is ongoing and, absent an injunction, will continue to harm the public at large. This relief is prospective, runs to the general public, and does not require the Court to consider the individual claims of any non-party. Plaintiffs and the general public have no adequate remedy at law to secure Defendant's future compliance with California law.

## COUNT XII

**Violation of the Consumers Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750–1784**

**(On Behalf of California Plaintiffs Tillery, Walsh and Rosenberg and the California Subclasses; and, as to the public injunction, on behalf of the California general public)**

457. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein.

458. To the extent Rule 9(b) of the Federal Rules of Civil Procedure applies to this claim, Plaintiffs incorporate the heightened-pleading allegations set forth in § XI, supra, which identify the party responsible for, the content of, the location and timing of, and the manner of Defendant's misrepresentations and omissions.

459. Prior to filing this Complaint, Plaintiffs Walsh, Rosenberg, and Tillery, on behalf of themselves and all similarly situated California consumers, provided Samsung with written notice pursuant to Cal. Civ. Code § 1782(a) and (c), sent by certified mail, return receipt requested, and addressed to Samsung's corporate headquarters and to Samsung's registered agent in California. The notice identified the particular violations of Cal. Civ. Code § 1770 alleged herein and demanded that Samsung correct, repair, replace, or otherwise rectify them. The notice was delivered on July 21, 2026. Samsung, through counsel, acknowledged the notice in writing on August 14, 2026,

denied any misrepresentation, and neither offered nor agreed to offer any correction, repair, replacement, or other remedy. More than thirty days have elapsed since delivery of the notice, and Samsung has failed to provide, or agree to provide within a reasonable time, an appropriate correction or remedy for all affected consumers as required by Cal. Civ. Code § 1782(b)–(c). Plaintiffs therefore seek damages under Cal. Civ. Code § 1780(a), in addition to injunctive and declaratory relief.

460. Plaintiffs and the members of the California Subclasses are "consumers" within the meaning of Cal. Civ. Code § 1761(d). The Samsung Smart TVs are "goods" within the meaning of § 1761(a). Plaintiffs' purchases of Samsung Smart TVs are "transactions" within the meaning of § 1761(e). The CLRA applies to Defendant's representations and omissions made to consumers through its packaging, marketing, and on-device user interface, even where the point-of-sale transaction occurred through an authorized retailer; privity is not required. See Kwikset Corp. v. Superior Ct., 51 Cal. 4th 310 (2011); Cal. Civ. Code § 1770(a).

461. Samsung engaged in unfair and deceptive acts and practices declared unlawful by Cal. Civ. Code § 1770(a), including subdivisions (5), (7), (9), (14), and (16), by representing that the Samsung Smart TVs have characteristics, uses, benefits, standards, qualities, or grades they do not have, advertising the goods with intent not to sell them as advertised, and representing that the transaction confers or involves rights, remedies, or obligations it does not.

462. Samsung represented, through its marketing, packaging, and on-device interface, that the Samsung Smart TVs are premium personal-entertainment devices delivering personalized content and a tailored viewing experience, while concealing that the devices conduct continuous, frame-by-frame ACR surveillance of everything displayed on screen, transmit that data in real time to multiple separate third parties (on information and belief including downstream advertising and identity-resolution partners), and facilitate the transfer of bulk consumer data to Defendant's affiliates.

463. Samsung had a duty to disclose the foregoing facts because (a) Samsung had exclusive knowledge of the ACR architecture, data pipelines, and downstream recipients, which

were not reasonably accessible to consumers; (b) Samsung actively concealed these practices through benign-sounding labels—most prominently the "Viewing Information Services" label—and affirmative misrepresentations that "Samsung neither collects any video footage nor any content displayed on the Device"; and (c) Samsung made partial representations about the devices' characteristics that were misleading absent disclosure of the surveillance.

464. The concealed and omitted facts were material: a reasonable consumer would consider them important in deciding whether to purchase or use a Samsung Smart TV. Had Samsung disclosed these facts at the point of sale or on its packaging or device interface, Plaintiffs and California Subclasses members would have been aware of them and would not have purchased their Samsung Smart TVs, or would have paid materially less. Because the omissions were material, reliance is presumed and inferred.

465. Plaintiffs have suffered "any damage" within the meaning of Cal. Civ. Code § 1780(a). Plaintiffs paid for, and overpaid for, their Samsung Smart TVs as a result of Defendant's deceptive practices, and were deprived of the benefit of their bargain and of the value of their personal information, as alleged above.

466. Defendant's unlawful practices are ongoing. Each named Plaintiff continues to own and use his or her Samsung Smart TV, which remains operational and connected, and Defendant's ACR system continues to intercept, collect, transmit, and disclose Plaintiffs' viewing activity and associated identifiers in real time and near-real time to the present day. Plaintiffs therefore face a real and immediate threat of continuing and future injury. An injunction would redress that injury by halting Defendant's ongoing and future collection and disclosure; monetary damages, which redress only past collection, cannot.

467. Plaintiffs lack an adequate remedy at law for the prospective relief sought in this Count. Monetary damages are retrospective and compensate only for past harm; the injunction sought here is prospective and is the only remedy that can prevent Defendant's continued and future interception and disclosure of Plaintiffs' and the public's viewing data.

468. Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs, individually and on behalf of the California Subclasses, seek actual damages in an aggregate amount of no less than $1,000, an order enjoining Defendant's unlawful methods, acts, and practices, restitution of property, punitive damages, and a declaration that those practices violate the CLRA.

469. Plaintiff Rosenberg is a "senior citizen" within the meaning of California Civil Code § 1761(f); Defendant's violations are continuing, and Plaintiff Rosenberg has been a senior citizen throughout the most recent years of Defendant's ongoing surveillance. A substantial number of the members of the California Subclasses are likewise senior citizens. Senior citizens are substantially more vulnerable to Defendant's deceptive and opaque consent design—including its reliance on buried, multi-layer opt-out settings—are less likely to discover or disable Defendant's ACR surveillance, and suffered harm as a result. Plaintiff Rosenberg, individually and on behalf of senior-citizen members of the California Subclasses, seeks the additional award of up to $5,000 provided by Cal. Civ. Code § 1780(b), and treble relief pursuant to Cal. Civ. Code § 3345.

470. In addition, on behalf of the general public, Plaintiffs seek a public injunction under the CLRA whose primary purpose and effect is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Samsung Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. This relief is prospective, runs to the general public as a whole rather than a discrete subset of similarly situated persons, and does not require the Court to consider the individual claims of any non-party.

471. Plaintiffs accordingly seek injunctive and declaratory relief requiring Samsung to: (a) cease intercepting, recording, collecting, using, and disclosing consumers' viewing data through ACR technology without first obtaining valid, informed, affirmative, and standalone consent; (b) obtain affirmative, informed, and standalone consent before enabling or engaging in any ACR-based data collection on its Smart TVs; (c) refrain from using deceptive terminology, pre-checked defaults, or dark patterns to obtain or imply consent; (d) implement clear, conspicuous, and truthful

disclosures regarding its data collection and sharing practices; and (e) provide current and future users a simple, effective, and easily accessible means to disable ACR functionality.

472. Concurrently with this Complaint, Plaintiffs file the affidavit required by Cal. Civ. Code § 1780(d) showing that this action is commenced in a proper forum.

## COUNT XIII

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Nationwide Classes, or in the alternative, the California Subclasses)

473. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

474. Plaintiffs bring this claim for unjust enrichment under California law.

475. Defendant received and retained benefits at the expense of Plaintiffs and members of the Class.

476. Specifically, Samsung received two distinct categories of benefit at Plaintiffs' expense. First, Samsung received the consumer purchase price for the Samsung Smart TVs Plaintiffs purchased—even where the immediate point-of-sale transaction was through a retailer such as Amazon, Best Buy, Costco, Sam's Club, Target, or Walmart, the substantial economic value of the consumer purchase price flowed back to Samsung as wholesale revenue, and Samsung would not have realized that wholesale revenue but for Plaintiffs' consumer-side purchases. Second, Samsung received—directly and through its commercial relationships with other downstream recipients—the substantial commercial benefit of the bulk ACR-derived data captured from Plaintiffs' in-home use of the Samsung Smart TV, which Defendant and its downstream partners monetized through targeted advertising, audience segmentation, identity-graph construction, and measurement and attribution products. By 2021, the smart-TV manufacturer Vizio publicly reported that its profits from monetization of ACR-derived consumer data exceeded its profits from the sale of the televisions themselves.

477. Defendant's retention of these benefits is unjust because Defendant secured them through misrepresentation, omission, and dark-pattern consent architecture: Defendant's marketing, packaging, and on-device disclosures concealed the true nature, scope, and downstream uses of Defendant's ACR-data collection, and Defendant's consent architecture was designed to create a false appearance of consumer agreement—through bundled multi-step setup flows, buried opt-out controls, and other manipulative interface design—without obtaining Plaintiffs' informed agreement to Defendant's ACR data collection.

478. In the alternative, Plaintiffs seek disgorgement of Defendant's ill-gotten gains as an independent remedy. Even if any individual Plaintiffs are unable to establish a corresponding economic loss, Defendant is not entitled to retain profits realized from the misappropriation of Plaintiffs' personal information and audiovisual viewing communications.

479. Plaintiffs conferred benefits on Samsung, including payment for the Smart TV and valuable data generated through Plaintiffs' use of the device.

480. Plaintiffs' viewing activity and associated data constituted valuable information that Samsung collected, analyzed, and monetized.

481. Samsung knowingly accepted and retained these benefits.

482. Samsung appreciated and understood that it was receiving valuable benefits from Plaintiffs, including access to and use of Plaintiffs' personal information.

483. Samsung obtained these benefits through its collection, use, and disclosure of Plaintiffs' viewing data via its Smart TVs and embedded ACR technology.

484. Samsung used Plaintiffs' data for commercial purposes, including advertising, analytics, profiling, and data monetization.

485. Samsung also shared or made this data available to third parties, thereby further profiting from Plaintiffs' information.

486. Defendant's retention of these benefits was unjust because it was obtained through deceptive, unlawful, and unfair conduct.

487. Samsung collected and used Plaintiffs' data without valid consent.

488. Plaintiffs and members of the Class did not consent to the conduct alleged in this Count, and any consent purportedly obtained by Samsung for that conduct was invalid. Plaintiffs incorporate by reference, as if fully set forth herein, the consent-defect allegations set forth in the section titled § XII, *supra*.

489. It would be inequitable and unjust for Samsung to retain the benefits it obtained from Plaintiffs and members of the Class.

490. As a direct and proximate result of Defendant's conduct, Plaintiffs and members of the Class have suffered harm.

491. Plaintiffs seek restitution, disgorgement of all ill-gotten gains, and all other relief available under California law.

**COUNT XIV**

**Public Injunctive Relief on Behalf of the General Public**

**(Against Defendant Samsung Electronics America, Inc.; and, in the alternative, Classwide Injunctive Relief on Behalf of the Nationwide Classes or the California Subclasses)**

492. Plaintiffs Tillery, Walsh and Rosenberg (for the purpose of this Count, "Plaintiffs") incorporate by reference all preceding paragraphs as though fully set forth herein, including the public-injunction allegations set forth in their UCL, CLRA, and California constitutional privacy counts.

493. Plaintiffs bring this claim for public injunctive and declaratory relief as a remedy independently authorized by, and integral to, the substantive claims pleaded herein. Plaintiffs seek public injunctive relief under three independent and mutually reinforcing bases: (i) the Unfair Competition Law, Cal. Bus. & Prof. Code § 17203; (ii) the Consumers Legal Remedies Act, Cal. Civ. Code § 1780(a)(2)—as to which Plaintiffs have complied with the pre-suit notice requirement of Cal. Civ. Code § 1782(a); and (iii) the self-executing California constitutional right to privacy, Cal. Const. art. I, § 1, for which injunctive relief is the recognized and primary remedy. To the extent the Court determines that injunctive relief is not properly pleaded as a stand-alone count,

Plaintiffs incorporate the allegations of this Count into each of the foregoing substantive counts (including the UCL count) as a remedial component.

494. The UCL and the CLRA are statutes "established for a public reason" within the meaning of Cal. Civ. Code § 3513, and binding case law holds that the statutory right to seek public injunctive relief under those consumer-protection statutes cannot be waived by private agreement and is unenforceable insofar as a predispute agreement purports to waive it in any forum.

495. The California constitutional right to privacy is self-executing and "creates a legal and enforceable right of privacy for every Californian." *White v. Davis*, 13 Cal. 3d 757 (1975). It protects natural persons against intrusions by private entities. *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1 (1994). Because that right was established for a public reason, the right to seek prospective injunctive relief restraining its ongoing violation is likewise a right that "cannot be contravened by a private agreement." Cal. Civ. Code § 3513.

496. Plaintiffs, on behalf of the general public, seek a public injunction under the UCL, the CLRA, and the California Constitution whose primary purpose and effect is to prohibit unlawful acts that threaten future injury to the general public—every California consumer who now owns, later purchases, or otherwise uses a Samsung Smart TV—rather than to redress past injury to Plaintiffs or any discrete group of prior purchasers. This relief is prospective, runs to the general public as a whole rather than a discrete subset of similarly situated persons, and does not require the Court to consider the individual claims of any non-party.

497. Samsung continues to manufacture, sell, and operate Smart TVs that perform ACR surveillance, such that members of the public who have not yet acquired a Samsung Smart TV will be subjected to the same unlawful practices upon doing so. Absent a public injunction, Samsung will continue these practices against the consuming public indefinitely.

498. Plaintiffs are aggrieved Californians whose constitutional and statutory privacy rights Samsung has violated, and they face a real and immediate threat of continued and future injury because they continue to own and use Samsung Smart TVs on which ACR functionality remains enabled or available. As aggrieved individuals with standing, Plaintiffs may seek public

injunctive relief that primarily benefits the general public without acting as private attorneys general or prosecuting the action on behalf of others.

499. Plaintiffs and the general public lack an adequate remedy at law; under the California constitutional right to privacy, injunctive relief—not damages—is the recognized remedy.

500. Plaintiffs accordingly seek a public injunction requiring Samsung to:

a. cease intercepting, recording, collecting, using, and disclosing consumers' viewing data through ACR technology without first obtaining valid, informed, affirmative, and standalone consent;

b. obtain affirmative, informed, and standalone consent before enabling or engaging in any ACR-based data collection on its Smart TVs;

c. refrain from using deceptive terminology, pre-checked defaults, or dark patterns to obtain or imply consent to ACR-based data practices;

d. implement clear, conspicuous, and truthful disclosures regarding its data collection and sharing practices; and

e. provide current and future users with a simple, effective, and easily accessible means to disable ACR functionality.

501. The balance of equities and the public interest favor a public injunction enjoining Defendant's ongoing unlawful, unfair, and deceptive conduct directed at California consumers at large.

502. In the alternative, and only to the extent the Court declines to grant public injunctive relief, Plaintiffs seek classwide injunctive relief on the substantive counts on behalf of the Nationwide Classes or, in the alternative, the California Subclasses, pleaded separately so as not to limit or privatize the public injunctive relief sought above.

503. Plaintiffs and the general public are therefore entitled to injunctive and declaratory relief as requested herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in their favor and

against Samsung as follows:

a. An order certifying this action as a class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel under Federal Rule of Civil Procedure 23;

b. A public injunction, on behalf of the general public, pursuant to Cal. Bus. & Prof. Code § 17203, Article I, § 1 of the California Constitution, and Cal. Civ. Code § 1780(a)(2), enjoining Samsung from deploying, operating, or enabling ACR technology that intercepts, records, or discloses the viewing activity or other personal information of California consumers without first obtaining clear, conspicuous, affirmative, and separately disclosed consent—the primary purpose and effect of which is to prohibit unlawful acts that threaten future injury to the general public, and which does not require adjudication of any non-party's individual claim;

c. In the alternative to the public injunction, classwide injunctive and declaratory relief on behalf of the Class;

d. Restitution and disgorgement under Cal. Bus. & Prof. Code § 17203 and Plaintiffs' unjust-enrichment claim;

e. On the CLRA Count, actual damages in an aggregate amount of no less than $1,000, restitution, and punitive damages pursuant to Cal. Civ. Code § 1780(a); the additional senior-citizen award pursuant to Cal. Civ. Code § 1780(b) and treble relief pursuant to Cal. Civ. Code § 3345; injunctive relief pursuant to Cal. Civ. Code § 1780(a)(2); and a declaration that Defendant's practices violate the CLRA;

f. On all Counts, an award of damages—actual, statutory, compensatory, general, special, incidental, consequential, nominal, and punitive—in amounts to be determined at trial;

g. A declaratory judgment that Defendant's practices violate the laws alleged herein;

h. Pre- and post-judgment interest to the extent provided by law;

i. An award of attorneys' fees and costs to the extent provided by law; and

j. Such other relief the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial for all claims so triable.

Dated: October 6, 2026

Respectfully submitted,

By: *<u>/s/ Catherine E. Ybarra</u>*

Catherine E. Ybarra (SBN # 283360)
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Tel: (213) 297-3807
E: cybarra@sirillp.com

Sonjay C. Singh (*pro hac vice anticipated*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Andrew R. Tate (*pro hac vice anticipated*)
**PRIVACY RIGHTS LAW LLC**
3379 Peachtree Road NE, Suite 700
Atlanta, Georgia 30326
Tel: (678) 250-5885
E: tate@privacyrightslaw.com

*Counsel for Plaintiffs and the Proposed Class*